**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| **NEW MEXICO CATTLE GROWERS'<br>ASSOCIATION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, et al.**<br><br>**Defendants,**<br><br>**and**<br><br>**AMIGOS BRAVOS, NEW MEXICO<br>ACEQUIA ASSOCIATION, and GILA<br>RESOURCES INFORMATION<br>PROJECT,**<br><br>**Intervening Cross-Claimants-Defendants,**<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, et al.,**<br><br>**Cross-Defendants.** | **No. 1:19–CV–00988–RB–SCY** |

## CROSS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I. PRELIMINARY STATEMENT

1.      This is an action for review of a final agency action under the Administrative

Procedure Act, 5 U.S.C. §§ 551 to 706, brought by Amigos Bravos, the New Mexico Acequia

1

Association, and the Gila Resources Information Project (the "Water Groups") against the United States Environmental Protection Agency ("EPA"), Andrew Wheeler in his official capacity as Administrator of EPA, the United States Department of Defense, Army Corps of Engineers ("Corps"), and Ricky Dale "R.D." James in his official capacity as Assistant Secretary of the Army for Civil Works. The intervenors seek review of the so-called "Navigable Water Protection Rule" that EPA and the Corps (sometimes called the "Agencies") promulgated earlier this year ("Replacement Rule"). The Agencies signed the final rule on January 23, 2020, and it was published in the *Federal Register* on April 21, 2020. 85 Fed. Reg. 22250. It is codified in various sections of 40 C.F.R. pts. 110, 112, 116, 117, 120, 122, 230, 232, 300, 302, and 401, and 33 C.F.R. pt. 328.

2. In the Replacement Rule, the Agencies redefine the scope of the Clean Water Act, 33 U.S.C. §§ 1251 to 1387, the Nation's pre-eminent water pollution control statue. Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this objective, the Clean Water Act establishes, among other things, permitting programs for the discharge of pollutants and "dredged and fill material" into "waters of the United States," effluent limits for discharges of pollutants into "waters of the United States," and water quality standards applicable to "waters of the United States."

3. The term "waters of the United States" is a key term for implementation of the Clean Water Act. The term delineates the scope of Clean Water Act jurisdiction, including its permitting programs, its effluent limits, and its water quality standards. However, the Clean Water Act does not define the term "waters of the United States." The Replacement Rule

2

defines the term "waters of the United States" by regulation; it is the latest of several attempts by EPA and the Corps to define and redefine the term.

4.      The Replacement Rule severely restricts the scope of the definition of "waters of the United States" under the Clean Water Act.  The Replacement Rule eliminates Clean Water Act jurisdiction over all ephemeral streams, which make up a high percentage – about 90% according to the New Mexico Environment Department – of the waters in New Mexico.  It eliminates Clean Water Act jurisdiction over many wetlands, many lakes, and many interstate streams.  The Replacement Rule defines "waters of the United States" more restrictively than the agencies have in the past, more restrictively than the interpretation of the United States Supreme Court, and more restrictively than Congress intended.

5.      The Water Groups are two local community-based environmental organizations and a state-wide organization of small farmers.  Because of the Replacement Rule, these organizations and their members have been and will be harmed by drinking from, boating in, swimming in, fishing in, and irrigating crops with waters that are no longer protected under the Clean Water Act.  These organizations and their members have been and will be harmed by the Replacement Rule in their health, their business interests, their farming activities, their recreational pursuits, and their aesthetic values.

6.      The Water Groups seek declaratory relief finding that the Replacement Rule violates the Administrative Procedure Act and vacating the Replacement Rule.

## II.  JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), and 2201 (declaratory judgment), and 5 U.S.C. §§ 703, 704 (review of final agency action).

9.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because all of the Water Groups reside in this District.

## III.  PARTIES

### A.  THE WATER GROUPS

10.     Amigos Bravos is a state-wide water conservation organization formed in 1988 and based in Taos, New Mexico.  It is a non-profit organization under section 501(c)(3) of the Internal Revenue Code.  26 U.S.C. § 501(c)(3).  Amigos Bravos is guided by social justice principles and dedicated to preserving and restoring the ecological and cultural integrity of New Mexico's water and the communities that depend on it.  Amigos Bravos has approximately 2,000 members.  Amigos Bravos is a "person" within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 551(2), 701(b)(2).

11.     The New Mexico Acequia Association is a state-wide, membership-based organization of acequias, or community ditches, regional associations of acequias and acequia members.  The New Mexico Acequia Association has approximately 350 acequia members and 1,000 individual members.  Acequias are political subdivisions of the State of New Mexico governed by New Mexico Law.  N.M. Stat. Ann. §§ 73-2-1 to 73-2-68, 73-2A-1 to 73-2A-3, 73-3-1 to 73-3-11.  The New Mexico Acequia Association was formed in 1990 and its principal place of business is Santa Fe, New Mexico.  It is a New Mexico non-profit corporation and a

4

non-profit organization under section 501(c)(3) of the Internal Revenue Code.  26 U.S.C. § 501(c)(3).  The New Mexico Acequia Association is dedicated to the protection of New Mexico's acequias; the farming and ranching traditions and culture of New Mexico's acequia communities; and the water that flows through the acequias.  The New Mexico Acequia Association is a "person" within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 551(2), 701(b)(2).

12.    The Gila Resources Information Project is a New Mexico nonprofit membership organization formed in 1998 and based in Silver City, New Mexico.  It is a non-profit organization under section 501(c)(3) of the Internal Revenue Code.  26 U.S.C. § 501(c)(3).  Its mission is to promote community health by protecting the environment and natural resources of southwest New Mexico.  The Gila Resources Information Project has approximately 1000 members.  The Gila Resources Information Project is a "person" within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 551(2), 701(b)(2).

**B.  THE DEFENDANTS**

13.    The United States Environmental Protection Agency ("EPA") is an executive agency of the Federal Government, created in 1970.  *See* Reorg. Plan No. 3 of 1970, 84 Stat. 2086.  EPA is responsible for the implementation of most of the water pollution control programs under the Clean Water Act.  *See* 33 U.S.C. § 1251(d).  EPA, jointly with the Corps, promulgated the Replacement Rule.  EPA is an "agency" of the United States within the meaning of the Administrative Procedure Act.  5 U.S.C. § 701(b)(1).

14.    Andrew R. Wheeler is the Administrator of EPA.  Administrator Wheeler, in his official capacity, signed the Replacement Rule on January 23, 2020.  Administrator Wheeler is

an "appropriate officer" of the United States within the meaning of the Administrative Procedure Act.  5 U.S.C. § 703.

15.     The United States Army Corps of Engineers ("Corps") is an agency of the Federal Government within the United States Army.  The United States Army is a service of the United States Department of Defense.  The Corps is responsible for the issuance of permits for the discharge of dredged and fill material into "waters of the United States" under section 404 of the Clean Water Act.   33 U.S.C. § 1344.   The Corps, jointly with EPA, promulgated the Replacement Rule.  The Corps is an "agency" of the United States within the meaning of the Administrative Procedure Act.  5 U.S.C. § 701(b)(1).

16.     Ricky Dale "R.D." James is Assistant Secretary of the Army for Civil Works. Assistant Secretary James' responsibilities include supervising the Corps.  Assistant Secretary James, in his official capacity, signed the Replacement Rule on January 23, 2020.  Assistant Secretary James is an "appropriate officer" of the United States within the meaning of the Administrative Procedure Act.  5 U.S.C. § 703.

## IV.  STATUTORY BACKGROUND

### A.  CLEAN WATER ACT

17.     Prior to enactment of the Clean Water Act, Congress enacted several laws intended to protect water quality.  More than twenty years earlier, Congress had enacted the Federal Water Pollution Control Act of 1948.  Pub. L. No. 80-845, 62 Stat. 1155 (1948); *see* H.R. Rep. No. 92-911, at 66.  Other statutes followed, including the Federal Water Pollution Control Act of 1956, Pub. L. No. 84-660, 70 Stat. 498 (1956); the Water Quality Act of 1965, Pub. L. No. 89-234, 79 Stat. 903 (1965); the Clean Water Restoration Act of 1966, Pub. L. No.

89-753, 80 Stat. 1246 (1966); and the Water Quality Improvement Act of 1970, Pub. L. No. 91-224, 84 Stat. 91 (1970).  All of this legislation, however, "ha[d] been keyed to an important principle of public policy: the States shall lead the national effort to prevent, control and abate water pollution."  S. Rep. No. 92-414, at 1 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3669. On the other hand, "the Federal role ha[d] been limited to support of, and assistance to, the States." *Id.*

18.     With states in the lead, the national effort to control water pollution was a dismal failure.  A congressional committee concluded in 1971 that "the national effort to abate and control water pollution ha[d] been inadequate in every vital aspect."  S. Rep. No. 92-414, at 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674.  The Nation's waters remained "severely polluted." *Id.*  Many of the nation's waters were "unfit for most purposes," including swimming and fishing. *Id.*  Further, "[r]ivers, lakes, and streams [were] being used to dispose of man's wastes, rather than to support man's life and health." *Id.*  The severity of the problem was underscored when, in June 1969, the Cuyahoga River in Cleveland, Ohio caught fire and burned for several days. *See United States v. City of Akron*, 794 F. Supp. 2d 782, 786 (N.D. Ohio 2011) (On June 22, 1969, "the Cuyahoga River caught fire" for "at least the tenth time," which "spurred a movement that led to the passage of the Clean Water Act in 1972."); *Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174-75 (2001) (Stevens, J., dissenting) ("In 1969, the Cuyahoga River in Cleveland, Ohio, coated with a slick of industrial waste, caught fire.").  Congress responded to that dramatic event, and to others like it, by enacting the Clean Water Act.

19.     Congress enacted the Clean Water Act, originally the Federal Water Pollution Control Act, on October 18, 1972.  Pub. L. No. 92-500, 86 Stat. 816 (1972).  The Clean Water Act represented a "total restructuring" and "complete rewriting" of federal law governing water pollution, placing the Federal government in the primary role of implementing the new water pollution control scheme.  *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (explaining that the Clean Water Act was "not merely another law 'touching interstate waters,'" but was "viewed by Congress as a 'total restructuring' and 'complete rewriting' of the existing water pollution legislation."); *see also Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 22 (1981) (noting the existing water pollution control scheme "was completely revised" by the enactment of the Clean Water Act).

20.     The express objective of the Clean Water Act, stated in the first sentence of the statute – section 101(a) – "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To achieve this objective, the Act set the goal of eliminating the discharge of pollutants into navigable waters by 1985.  33 U.S.C. § 1251(a)(1).  It set an interim goal of attaining water quality that provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water by 1983.  33 U.S.C. § 1251(a)(2).  The Act also established a national policy of prohibiting the discharge of toxic pollutants in toxic amounts.  33 U.S.C. § 1251(a)(3).  Although the Clean Water Act has been very successful in reducing pollution of the Nation's waters, these goals are far from being met.

21.    Congress enacted major amendments to the Clean Water Act in 1977, Pub. L. No. 95–217, 91 Stat. 1566 (1977); in 1982, Pub. L. No. 97-357 (1982), 96 Stat. 1712, and in 1987, Pub. L. No. 100-4, 101 Stat. 7 (1987).

22.    The Clean Water Act's suite of water pollution control programs applies to "navigable waters" or to the discharge of pollutants into "navigable waters."  The Act defines "navigable waters" broadly as the "waters of the United States."  33 U.S.C. § 1362(7).  Thus, the term "waters of the United States" is a key term to the Act's regulatory scheme.  It delineates the scope of Clean Water Act jurisdiction.  Indeed, the phrase "jurisdictional waters" is commonly used to refer to "waters of the United States."

23.    When it enacted the Clean Water Act in 1972, Congress stated its intention that the definition of "navigable waters" (i.e., "waters of the United States") be interpreted broadly. Congress expressed this intention repeatedly in the legislative history of the 1972 enactment. For example, the House report on H.R. 11896, the bill that eventually became the Clean Water Act, stated, "The Committee fully intends that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes."  H.R. REP. NO. 92-911 at 131 (1972).  In discussing the definition of "waters of the United States," the Senate report on S. 2770, the companion Senate bill, lamented that "through a narrow interpretation of the definition of interstate waters the implementation [of the] 1965 act was severely limited."  S. REP. NO. 92-414 at 77 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668.  The conference report echoes the House admonition: "The conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been

9

made or may be made for administrative purposes." S. REP. NO. 92-1236 at 144 (1972) (Conf. Rep.).

24.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant except in compliance with a permit.  33 U.S.C. § 1311(a).  The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters [i.e., "waters of the United States"] from any point source."  33 U.S.C. § 1362(12).  The Clean Water Act establishes two primary permit programs.

25.     Section 402 of the Clean Water Act establishes the National Pollutant Discharge Elimination System (NPDES) permit program.  33 U.S.C. § 1342.  It authorizes EPA to issue permits – commonly called NPDES permits – for the discharge of any pollutant into navigable waters (i.e., "waters of the United States").  33 U.S.C. § 1342(a)(1).  EPA is required to prescribe conditions on NPDES permits to ensure compliance with other provisions of the Act.  33 U.S.C. § 1342(a)(2).  For example, NPDES permits must comply with effluent limitations set by EPA for categories of water pollution sources.  33 U.S.C. § 1311(b).  NPDES permits must also comply with standards of performance, set by EPA, for newly constructed sources of water pollution. 33 U.S.C. § 1316.

26.     Section 404 of the Clean Water Act establishes a permit program for the discharge of dredged or fill material.  33 U.S.C. § 1344.  It authorizes the Corps to issue permits for the discharge of dredged or fill material into navigable waters (i.e., "waters of the United States").  33 U.S.C. § 1344(a).

27.     Section 401 of the Act requires a state water quality certification when a federally permitted or licensed project in a state may result in a discharge into navigable waters (i.e.,

"waters of the United States").  A state is authorized to deny, grant, or grant with conditions a water quality certification for such projects based on its determination whether a project complies with all applicable Federal requirements and appropriate requirements of state law.  33 U.S.C. § 1341(a)(1), (d).

28.     Section 303 of the Clean Water Act requires each state to develop water quality standards for waters within that state.  33 U.S.C. § 1313; *Defenders of Wildlife v. EPA*, 415 F.3d 1121, 1124 (10th Cir. 2005).  Water quality standards have three components.  First, states must specify designated uses for each body of water, such as public water supply, fish propagation, or agriculture.  Second, they must establish water quality criteria for each body of water, which set a limit on the level of various pollutants that may be present without impairing the designated use of the water body.  And third, states must adopt an antidegradation policy designed to prevent the water body from becoming impaired such that it cannot sustain its designated use. 33 U.S.C. § 1313(c).

29.     The Clean Water Act permit programs are delegated programs.  Section 402(b) of the Act allows any state to apply to EPA to establish and administer its own permit program under state law for discharges of pollutants into navigable waters (i.e., "waters of the United States").  33 U.S.C. § 1342(b).  Section 404(h) of the Act likewise allows any state to apply to EPA to establish and administer its own permit program under state law for discharges of dredged or fill material into navigable waters (i.e., "waters of the United States").  33 U.S.C. § 1344(g).  Through these delegated programs, Congress sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate

pollution, [and] to plan the development and use . . . of land and water resources . . . ."  33 U.S.C. § 1251(b).

30.     The State of New Mexico does not have a permit program under State law for discharges of pollutants into navigable waters.  EPA administers the NPDES permit program under section 402 of the Clean Water Act in New Mexico.  The State of New Mexico does not have a permit program under State law for discharges of dredged and fill material into navigable waters.  The Corps administers the permit program for dredged and fill material under section 404 of the Clean Water Act in New Mexico.

31.     Section 311 of the Clean Water Act, which is separate from the permit programs, addresses spills of oil or hazardous substances.  33 U.S.C. § 1321.  Section 311(b) generally prohibits discharges of oil or hazardous substances into "navigable waters of the United States."  33 U.S.C. § 1321(b)(3).  Section 311(c) of the Act provides for Federal actions for removal of a discharge of oil or a hazardous substance into or on navigable waters and to prevent or mitigate the threat of such a discharge.  33 U.S.C. § 1321(c).

32.     Section 313 of the Clean Water Act includes a clear and unambiguous waiver of Federal sovereign immunity from compliance under the Act.  33 U.S.C. § 1323.  Section 313(a) requires each department, agency, and instrumentality of the Federal government to comply with the substantive and procedural requirements of the Act, including state and local requirements, in the same manner and to the same extent as any nongovernmental entity.  33 U.S.C. § 1323(a).  Many federal facilities in New Mexico have NPDES permits, issued by EPA, for the discharge of pollutants into waters that were, before adoption of the Replacement Rule, "waters of the United States."

**B.  ADMINISTRATIVE PROCEDURE ACT**

33.     Congress enacted the Administrative Procedure Act to set forth the extent of judicial authority to review executive agency action for procedural correctness.  *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 513 (2009).

34.     The Administrative Procedure Act provides for judicial review of "final agency action for which there is no adequate remedy in a court."  5 U.S.C. § 704.  An "agency action" includes an "agency rule."  5 U.S.C. §§ 551(13), 701(b)(2).  An agency "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. §§ 551(4), 701(b)(2).  A "rule making" is an "agency process for formulating, amending, or repealing a rule."  5 U.S.C. § 551(5).

35.     The Administrative Procedure Act provides that a Federal agency must publish notice of a proposed rule making in the *Federal Register*.  5 U.S.C. § 553(b).  The agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and must give "consideration of the relevant matter presented" in public comments.  5 U.S.C. § 553(c).

36.     The opportunity for comment during an agency rulemaking must be meaningful. Among other things, the agency must provide the reasoning for its proposed rulemaking, the agency must allow enough time for the public to comment, and the agency must meaningfully respond to relevant comments received.  "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals."  *Conn. Light & Power v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982).

13

37.     When a proposed regulation is aimed at eliminating protections that were previously adopted by an agency, notice and comment also "ensures that . . . [the] agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of [the removal of protections]."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).

38.     In an agency rulemaking, "[t]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. –, 136 S.Ct. 2117, 2126 (2016).

39.     The Administrative Procedure Act requires a reviewing court to set aside an agency action if, among other things, it is determined to be: 1) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; 2) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or 3) without observance of procedures required by law.  5 U.S.C. § 706(2)(A), (C), (D).

40.     An agency action is "arbitrary and capricious" under the Administrative Procedure Act "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency action is "arbitrary and capricious" if it violates the basic premise that "[a]n agency must treat similar

14

cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

41.     If an agency promulgates a rule that revises or reverses its long-standing policy or practice, the agency must demonstrate an awareness of its change in position; must articulate a reasoned explanation and rational basis for the new policy; and must consider and evaluate the reliance interests engendered by the agency's prior position.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. –, 136 S.Ct. 2117, 2126 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).   An unexplained inconsistency in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."   *Encino Motorcars*, 136 S.Ct. at 2126.

42.     The Administrative Procedure Act unequivocally waives the sovereign immunity of the Federal government.  5 U.S.C. § 702.

## V.  PRIOR INTERPRETATIONS OF "WATERS OF THE UNITED STATES"

### A.  AGENCY REGULATIONS

43.     After enactment of the Clean Water Act in 1972, EPA and the Corps repeatedly attempted to define the term "waters of the United States" by regulation.

44.     EPA issued regulations defining "waters of the United States" in 1973, 1980, and 1988, while the Corps issued regulations defining "waters of the United States" in 1974, 1977, 1982, and 1986.  *See* EPA, Final Rule, 38 Fed. Reg. 13528, 13529 (May 22, 1973) (definition of "navigable waters" codified at 40 C.F.R. § 125.1); Army Corps of Eng'rs, Final Rule, 39 Fed. Reg. 12115, 12119 (Apr. 3, 1974) (definition of "waters of the United States" codified at 33 C.F.R. § 209.120), *ordered rescinded and revoked*, *Natural Res. Def. Council, Inc. v. Callaway*,

392 F. Supp. 685 (D.D.C. 1975); Army Corps of Engineers, Final Rule, 42 Fed. Reg. 37,122, 37,144 (July 19, 1977) (definition of "waters of the United States" codified at 33 C.F.R. § 323.2(a)); EPA, Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,346 (Dec. 24, 1980) (definition of "waters of the United States" codified at 40 C.F.R. § 230.3(s)); Army Corps of Engineers, Interim Final Rule for Regulatory Programs of the Corps of Engineers, 47 Fed. Reg. 31,794, 31,810 (July 22, 1982) (definition of "waters of the United States" codified at 33 C.F.R. 323.2(a)); Army Corps of Engineers, Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206, 41,250 (Nov. 13, 1986) (definition of "waters of the United States" codified at 33 U.S.C. § 328.3(a)); EPA, Clean Water Act Section 404 Program Definitions and Permit Exemptions, 53 Fed. Reg. 20,764, 20,774 (June 6, 1988) (definition of "waters of the United States" codified in 40 C.F.R. § 232.2(q)).

45.     The regulations that EPA and the Corps issued in the 1970s and 1980s evolved over time, but they defined "waters of the United States" essentially to cover: 1) waters used or susceptible of use in interstate and foreign commerce (so-called "traditional navigable waters"); 2) interstate waters; 3) all other waters the degradation of which could affect navigable waters because they are used by interstate travelers for recreation, used to harvest fish or shellfish sold in interstate commerce, or used for industrial purposes by interstate industries; 4) impoundments of such waters; 5) tributaries to such waters; 6) wetlands adjacent to such waters; and 7) the territorial seas.  In addition, the Agencies noted that "waters of the United States also includes waters used as habitat by migratory birds and endangered species, and waters used to irrigate crops sold in interstate commerce.  51 Fed. Reg. at 41,217; 53 Fed. Reg. at 20,765.

**B. S**UPREME **C**OURT **D**ECISIONS

46.     In 1985, the United States Supreme Court reviewed the clause in the definition of "waters of the United States" that covered wetlands adjacent to other jurisdictional waters. *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985).  Noting that "Congress chose to define the waters covered by the [Clean Water] Act broadly," *id.* at 133, the Court unanimously held that the Act extends to "adjacent wetlands" – those that "border . . . or are in reasonable proximity to other waters of the United States." *Id.* at 134.  The Court upheld the Corps' "ecological judgment" that "wetlands may affect the water quality of adjacent lakes, rivers, and streams." *Id.*  The Court noted that wetlands "may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in adjacent bodies of water." *Id.* at 135.

47.     In 2001, the Supreme Court reviewed a challenge to the Corps' interpretation of "waters of the United States" as covering waters used as habitat by migratory birds. *Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001).  The Court reaffirmed that Clean Water Act jurisdiction extends to non-navigable waters with a "significant nexus" to navigable waters. *Id.* at 167.  Applying that standard, the Court held that the Corps could not regulate an isolated, abandoned sand gravel pit created for mining activities *solely* on the basis that it served as habitat for migratory birds. *Id.*  In *United States v. Hubenka*, the Tenth Circuit applied the significant nexus test of *Riverside Bayview* and *SWANCC*, holding that the Act extends to all tributaries with "the potential for pollutants to migrate . . . to navigable waters."  438 F.3d 1026, 1033–34 (10th Cir. 2006).

48.     In 2006, the Supreme Court addressed whether the Act covers wetlands that "are not adjacent to waters that are navigable in fact." 547 U.S. 715, 759 (Kennedy, J., concurring). The Court split 4-1-4 over the appropriate legal standard for delineating the Act's jurisdiction, but five Justices held that the Act extends – at the very least – to non-adjacent, non-navigable waters that have a "significant nexus" with navigable waters.  *Id.* at 780, 787 (Kennedy, J., concurring); *id.* at 810 (Stevens, J., dissenting).

49.     Justice Scalia (joined by the Chief Justice and Justices Thomas and Alito) wrote the "plurality" opinion in *Rapanos*.  According to Justice Scalia, "the phrase 'waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, and lakes."  547 U.S. at 739.  Excluded from the phrase are "channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."  *Id.* Justice Scalia acknowledged that Clean Water Act jurisdiction extended over some intermittent streams: "[w]e do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought."  And "we also do not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months."  *Id.* at 733, n.5 (emphasis in original).  But he gives little guidance on how to distinguish those intermittent streams that he would include and those that he would exclude, merely stating that "[c]ommon sense and common usage distinguish between a wash and seasonal river."  *Id.*  As to adjacent wetlands, Justice Scalia concluded that "only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own

18

right . . . are 'adjacent to' such waters and covered by the Act." *Id.* at 742.  Five members of the Court rejected Justice Scalia's limitations.

50.     Justice Kennedy wrote a concurring opinion in *Rapanos*.  But he concurred only in the result; he expressly rejected Justice Scalia's rationale.  He described the restrictive scope of Clean Water Act jurisdiction expressed in Justice Scalia's opinion as "without support in the language or purposes of the Act or in our cases interpreting it."  547 U.S. at 768 (Kennedy, J., concurring).   According to Justice Kennedy, to be a "water of the United States," a non-navigable water or wetland "must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759.  Wetlands have the requisite nexus, "and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of" navigable waters. *Id.* at 780.  Justice Kennedy also concluded that if the wetland is adjacent to navigable-in-fact waters, then the Corps "may rely on adjacency to establish its jurisdiction." *Id.* at 782.

51.     Justice Stevens (joined by Justices Souter, Breyer, and Ginsburg) wrote a dissenting opinion in *Rapanos*.  He noted the "plurality's dramatic departure from . . . *Riverside Bayview*," and that "no party or amicus ha[d] suggested either of" Justice Scalia's limitations. *Id.* at 800.  The dissent found that both the plurality's and Justice Kennedy's opinions unduly infringed on federal authority under the Act, and would affirm federal jurisdiction "in all . . . cases in which either the [Scalia or Kennedy] . . . test is satisfied." *Id.* at 809-10 ( Stevens, J., dissenting).   Justice Stevens also suggested a way to resolve the dilemma of two competing minority opinions.  He observed that "all four Justices who have joined this [dissenting] opinion

would uphold the Corps' jurisdiction in [any case] in which either . . . test is satisfied." 547 U.S. at 810 (Stevens, J. dissenting). Thus, the votes of the four dissenters ensure that Clean Water Act jurisdiction extends to all waters satisfying either Justice Scalia's or Justice Kennedy's test.

52. Thus, the *Rapanos* case produced two quite different judge-made tests for determining whether a water body is a "water of the United States." The first test, formulated in Justice Kennedy's opinion, is whether the water body has a "significant nexus" to a navigable water. The second test, formulated in Justice Scalia's opinion, is whether the water body is "relatively permanent [and] standing or continuously flowing." If a wetland is at issue, the first test is formulated somewhat differently: whether the wetland is "adjacent" to either a navigable water or a continuously flowing tributary to a navigable water. A wetland is "adjacent" to a water body if it has "a direct surface connection" to the water body.

53. The competing *Rapanos* opinions have created a dilemma for the lower Federal courts. Three courts of appeals have interpreted the *Rapanos* opinions to acknowledge Clean Water Act jurisdiction if either the Scalia "continuously flowing" test or the Kennedy "significant nexus" test is met, as Justice Stevens suggested in his dissent. *United States v. Johnson*, 467 F.3d 56, 64 (1st Cir. 2006); *United States v. Baily*, 571o F.3d 791, 799 (8th Cir. 2009); *United States v. Donovan*, 661 F.3d 174, 184 (3d Cir. 2011). As the court stated in *Johnson*, "[i]f Justice Kennedy's test is satisfied, then at least Justice Kennedy plus the four dissenters would support jurisdiction," and "[i]f the plurality's test is satisfied, then at least the four plurality members plus the four dissenters would support jurisdiction." 467 F.3d at 464. Four other appeals courts have concluded that the "significant nexus" test alone is the appropriate test for determining Clean Water Act jurisdiction. *United States v. Robison*, 505

F.3d 1209, 1222 (11th Cir. 2007); *N. Cal. River Watch v, City of Healdsburg*, 496 F.3d 993, 999-

1000 (9th Cir. 2007); *United States v. Gerke*, 464 F.3d 723, 724 (7th Cir. 2006).  *Cf. Precon Dev.

Corp. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 288-89 (4th Cir. 2011) (parties stipulated to

the "significant nexus" test).  The U.S. Court of Appeals for the Tenth Circuit has not ruled on

the issue, but as noted, it adopted the significant nexus test before *Rapanos* in *Hubenka*.

## C.  AGENCY GUIDANCE

54.     After the *Rapanos* decision, EPA and the Corps prepared guidance, issued in 2007

and revised in 2008, on interpreting the *Rapanos* opinions and making determinations of Clean

Water Act jurisdiction.   EPA & Army Corps of Engineers, Clean Water Act Jurisdiction

Following the Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United

States* 3 (Dec. 2, 2008).  The "*Rapanos* Guidance" purported to implement Justice Kennedy's

"significant nexus" test.

55.   The *Rapanos* Guidance stated that "regulatory jurisdiction under the [Clean Water

Act] exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied."

Further, EPA and the Corps stated that their interpretation of the "significant nexus" test would

be applied to determine if a non-navigable, non-permanent tributary or a wetland adjacent to a

non-navigable, non-permanent tributary is a "water of the United States" under the Clean Water

Act.   *Id.* at 8-12.   Making this fact-specific determination was often difficult and time-

consuming, however, leading to uncertainty and confusion.

## D.  THE 2015 CLEAN WATER RULE

56.     In 2011, the Agencies initiated a rulemaking to clarify the scope of the Clean

Water Act's coverage; they published a final rule in 2015.  EPA & Army Corps of Engineers,

Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (Jun. 29, 2015) ("Clean Water Rule"). The Agencies stated that the rule would ensure "predictability," "consistency," and "protection for the nation's public health and aquatic resources." *Id.* at 37,054. The Clean Water Rule went into effect on August 28, 2015. *Id.*

57. The Clean Water Rule defined "waters of the United States" to cover: 1) waters used or susceptible of use in interstate and foreign commerce ("traditional navigable waters"); 2) interstate waters; 3) the territorial seas; 4) impoundments of such waters; 5) tributaries to such waters; 6) waters adjacent to such waters; 7) certain specific classes of wetlands (prairie potholes, Carolina bays, Delmarva bays, pocosins, western vernal pools, and Texas coastal prairie wetlands) having a significant nexus to such waters; and 8) waters within the 100-year floodplain or within 4,000 feet of the high water mark of jurisdictional waters if there is a significant nexus. 80 Fed. Reg. at 37,104-05, 37,106-07, 37,108-09, 37,110, 37,112, 37,114, 37,116, 37,117-18, 37,119-20, 37,121-22, 37,123-24, 37,125-26.[1]

58. The Clean Water Rule added a new definition of "tributary." The 2015 Rule defined the term essentially as any water that contributes significant flow to a jurisdictional water and that is characterized by the presence of a bed and banks and an ordinary high water mark. 80 Fed. Reg. at 37,075-80, 37,105-06, 37,107, 37,109, 37,111, 37,113, 37,115, 37,117, 37,119, 37,120-21, 37,122-23, 37,124, 37,126. A tributary that met this definition effectively met the "significant nexus" test. *Id.* at 37,068. Under the Clean Water Rule, "the flow in the tributary may be perennial, intermittent, or ephemeral." *Id.* at 37,076.

---

[1] The Clean Water Rule added the identical new definition of "waters of the United States" to a dozen provisions of EPA and Corps regulations.

59.     The Clean Water Rule added a new definition of "adjacent."  The 2015 Rule defined the term essentially as "bordering, contiguous, or neighboring a [jurisdictional] water," including waters separated by constructed dikes or barriers or natural berms.  The term also includes all waters that connect segments of jurisdictional waters and all waters at the head of jurisdictional waters.  80 Fed. Reg. at 37,080-86, 37,105, 37,107, 37,109, 37,111, 37,113, 37,115, 37,116-17, 37,118, 37,120, 37,122, 37,124, 37,126.

60.     The Clean Water Rule added a new definition of "neighboring."  The 2015 Rule defined the term, which was part of the definition of "adjacent," as located within a specified distance of a jurisdictional water, established by the high water mark.  80 Fed. Reg. at 37,105, 37,107, 37,109, 37,111, 37,113, 37,115, 37,117, 37,118-19, 37,120, 37,122, 37,124, 37,126.

61.     Prior to issuing the Clean Water Rule, the EPA Office of Research and Development prepared a peer-reviewed scientific report that synthesized the published scientific literature and summarized the current understanding of the mechanisms by which streams and wetlands affect the chemical, physical, and biological integrity of downstream waters.  80 Fed. Reg. at 37,061-62.  Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (EPA/600/R–14/475F) (Jan. 2015) ("Science Report"). The Science Report was based on the compilation and analysis of more than 1,200 peer-reviewed scientific publications.  80 Fed. Reg. at 37,057.  The draft Science Report was reviewed by an expert panel created by EPA's Science Advisory Board.  *Id.* at 37,062.  EPA also released the draft report and invited the public to comment on the draft.  *Id.*  The Science Advisory Board was highly supportive of the Report's conclusions.  *Id.*

23

62.    The Science Report reached several "major conclusions" that guided the Agencies' interpretation of the phrase "waters of the United States."  80 Fed. Reg. at 37,062-64. Among the most significant conclusions was confirmation that tributaries and adjacent wetlands have a tremendous effect on the quality of waters downstream.  *Id.* at 37,063.

63.    First, the Science Report concluded that "[t]he scientific literature unequivocally demonstrates that streams, individually or cumulatively, exert a strong influence on the chemical, physical, and biological integrity of downstream waters."  80 Fed. Reg. at 37,603.  This conclusion applies to "all tributary streams, including perennial, intermittent, and ephemeral streams."  *Id.*; Science Report at ES-2.

64.    Second, the Science Report concluded that "[t]he scientific literature clearly shows that wetlands and open waters in riparian areas and floodplains are chemically, physically, and biologically integrated with rivers, and function to preserve water quality."  80 Fed. Reg. at 37,603; Science Report at ES-2 to ES-3.  Further, "[w]etlands and open waters in non-floodplain landscape settings . . . provide numerous functions that benefit downstream water integrity."  80 Fed. Reg. at 37,603; Science Report at ES-3 to ES-4.

65.    Prior to issuing the Clean Water Rule, EPA and the Corps engaged in an extensive public participation process.  The Agencies held over 400 meetings nationwide with various stakeholders, including states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, and other federal agencies.  80 Fed. Reg. at 37,057.  EPA and the Corps proposed the rule on April 21, 2014.  79 Fed. Reg. 22,188 (Apr. 21, 2014).  EPA and the Corps accepted comments on the proposed rule for over 200 days until November 14, 2014.  80 Fed. Reg. at 37,103.  They received more than one

million comments from the public, a substantial majority of which were favorable.  80 Fed. Reg. at 37,057.

## VI.  CURRENT RULEMAKINGS

### A.  PRELUDE TO THE REPLACEMENT RULE

66.     Efforts to repeal or replace the Clean Water Rule began in early 2017.  On February 28, 2017, the White House issued an Executive Order directing the EPA and Corps to review the Clean Water Rule for consistency with the Administration's policy to promote economic growth, minimize regulatory uncertainty, and show due regard for the roles of Congress and the States.  Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States" Rule.  Exec. Order No. 13,778, §§ 1, 2(a), 82 Fed. Reg. 12,497 (Feb. 28, 2017).  The Executive Order required the Agencies to "publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law." *Id.* § 2(a).  Further, the Executive Order instructed the Agencies to "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in Rapanos v. United States." *Id.* § 3.

67.     On October 19, 2019, EPA and the Corps published a final rule repealing the Clean Water Rule.  84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule").  The rule also "recodified" the rules existing before 2015. *Id.*

68.     On February 14, 2019, EPA and the Corps published a proposed rule revising the definition of "waters of the United States" under the Clean Water Act.  EPA & Army Corps of Engineers, Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14, 2019) ("Proposed Replacement Rule").

25

69.     EPA and the Corps received public comment on the Proposed Replacement Rule revising the definition of "waters of the United States" for just sixty days, until April 15, 2019. 84 Fed. Reg. at 56,626.  Many commenters requested additional time to submit comments, but the Agencies did not grant the requests.

70.     On April 15, 2019, Amigos Bravos and the New Mexico Environmental Law Center submitted comments to the agencies on the Proposed Replacement Rule.  EPA Docket ID No. EPA-HQ-OW-2018-0149-4921.  On April 15, 2019, the New Mexico Acequia Association submitted comments to the agencies on the Proposed Replacement Rule  EPA Docket ID No. EPA-HQ-OW-2018-0149-4988.  On April 15, 2019, Amigos Bravos and the Gila Resources Information Project, along with fifty other environmental, community, and conservation organizations and the Village of Questa, New Mexico, submitted comments to the agencies on the Proposed Replacement Rule  EPA Docket ID No. EPA-HQ-OW-2018-0149-4636.

**B.  THE 2020 REPLACEMENT RULE**

71.     On April 21, 2020, EPA and the Corps issued the "Replacement Rule" – the final rule revising the definition of "waters of the United States" under the Clean Water Act – which is the subject of this challenge.   EPA and Army Corps of Engineers, The Navigable Water Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020) ("Replacement Rule").

72.     The Replacement Rule defines "waters of the United States" to cover: 1) waters used or susceptible of use in interstate and foreign commerce ("traditional navigable waters") and territorial seas; 2) tributaries; 3) lakes and ponds, and impoundment of jurisdictional waters;

and 4) adjacent wetlands.  85 Fed. Reg. at 22,338 (codified at 33 C.F.R. § 328.3(a), 40 C.F.R. § 120.2(1)).  The Replacement Rule went into effect on June 22, 2020.  *Id.* at 22,250.

73.     The Replacement Rule revised the definition of "tributary."  The Replacement Rule defines the term essentially as "a river, stream, or similar naturally occurring surface water channel that contributes surface water flow to a [jurisdictional] water . . . in a typical year."  A tributary must be perennial or intermittent in a typical year.  85 Fed. Reg. at 22,339, 22,341 (codified at 33 C.F.R. § 328.3(c)(12), 40 C.F.R. § 120.2(3)(xii)).  Thus, the definition of "tributary" does not include ephemeral streams.  *Id.*  The Agencies, however, had previously found that ephemeral tributaries exert significant chemical, physical, and biological effects on downstream navigable waters.  *See* 80 Fed. Reg. at 37,603; Science Report at ES-2.

74.     The Replacement Rule added a new definition of "ephemeral."  The Replacement Rule defines the term as "surface water flowing or pooling only in direct response to precipitation (e.g., rain or snow fall)."  85 Fed. Reg. at 22,338, 22,340 (codified at 33 C.F.R. § 328.3(c)(3), 40 C.F.R. § 120.2(3)(iii)).

75.     The Replacement Rule added a new definition of "intermittent."  The Replacement Rule defines the term as "surface water flowing continuously during certain times of the year and more than in direct response to precipitation (e.g., seasonally when the groundwater table is elevated or when snowpack melts)."  85 Fed. Reg. at 22,338, 22,340 (codified at 33 C.F.R. § 328.3(c)(5), 40 C.F.R. § 120.2(3)(v)).

76.     The Replacement Rule added a new definition of "adjacent wetlands."  The Replacement Rule defines the term essentially as wetlands that abut, meaning to touch at least one point, a jurisdictional water; wetlands that are inundated by flooding from a jurisdictional

27

water; wetlands that are separated from a jurisdictional water only by a natural berm or bank; and wetlands that are separated from a jurisdictional water only by an artificial dike or barrier that allows a "direct hydrological surface connection" between the wetland and the jurisdictional water.  85 Fed. Reg. at 22,338 (codified at 33 C.F.R. § 328.3(c)(1), 40 C.F.R. § 120.2(3)(i)).

77.    The Replacement Rule added a new definition of "typical year."  The Replacement Rule defines the term to mean "when precipitation and other climatic variables are within the normal periodic range (e.g., seasonally, annually) for the geographic area of the applicable aquatic resource based on a rolling thirty-year period."  85 Fed. Reg. at 22,339 (codified at 33 C.F.R. § 328.3(c)(13), 40 C.F.R. § 120.2(3)(xiii)).  The new definition of "typical year" delimits almost every category of jurisdictional waters.  *See, e.g.*, Replacement Rule, 85 Fed. Reg. at 22,307 ("adjacent wetlands" are jurisdictional if, e.g., they "are inundated by flooding from [other jurisdictional waters] in a *typical year*," or if they "are physically separated from [other jurisdictional waters] only by an . . . artificial structure . . . that allows for a direct hydrologic surface connection between [them] in a *typical year*"), 22,286 ( "tributar[ies]" are covered if, e.g., they "contribute . . . surface water flow to a [traditional navigable water] in a *typical year*," directly or indirectly, and are "perennial or intermittent in a *typical year*.") (emphasis added).

78.    The Replacement Rule does not include interstate waters in the definition of "waters of the United States."  The Replacement Rule entirely "removes interstate waters, including interstate wetlands, as a separate category of 'waters of the United States.'"  85 Fed. Reg. at 22282-83.

79.    The Replacement Rule expressly excludes ephemeral features, including ephemeral streams, from the definition of "waters of the United States." The Replacement Rule lists ephemeral features as waters that are "non-jurisdictional." 85 Fed. Reg. at 22,338, 22,340 (codified at 33 C.F.R. § 328.3(b)(3), 40 C.F.R. § 120.2(2)(iii)).

80.    The Replacement Rule expressly excludes groundwater from the definition of "waters of the United States." The Replacement Rule lists groundwater as waters that are "non-jurisdictional." 85 Fed. Reg. at 22,338, 22,340 (codified at 33 C.F.R. § 328.3(b)(2), 40 C.F.R. § 120.2(2)(ii)).

## C.  DEFICIENCIES IN THE REPLACEMENT RULE

81.    The Replacement Rule disregards the objective of the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *See* 33 U.S.C. § 1251(a).

82.    The Replacement Rule disregards the "significant nexus" test for determining whether a water that is not a traditionally navigable water is a "water of the United States," as enunciated by Justice Kennedy in his concurring opinion in *Rapanos v. United States*. In circumstances where the "significant nexus" test is satisfied, a majority of the Supreme Court would find Clean Water Act jurisdiction.

83.    The Replacement Rule relies in large part on the test enunciated by Justice Scalia in his plurality opinion in *Rapanos v. United States* to determine whether a tributary or an adjacent wetland is a "water of the United States." A majority of the Supreme Court rejected the plurality opinion as defining the scope of "waters of the United States."

84.     The Replacement Rule expressly excludes all ephemeral features, including ephemeral streams, from Clean Water Act jurisdiction.  85 Fed. Reg. at 22,338, 22,340 (codified at 33 C.F.R. § 328.3(b)(3), 40 C.F.R. § 120.2(2)(iii)).   The exclusion extends to ephemeral features that have a "significant nexus" to jurisdictional waters.   Yet ephemeral streams and other ephemeral features having a "significant nexus" to downstream "waters of the United States" help sustain the chemical, physical, and biological integrity of those downstream jurisdictional waters.  Science Report.

85.     The Replacement Rule creates an unworkable distinction between "intermittent" streams and "ephemeral" streams based on an indeterminate and enigmatic "typical year." Although the agencies state that they are providing a "clear definition" of "tributary" that is "easier to implement," 85 Fed. Reg. at 22,291, that is not the case.  For example, in one year a given tributary stream might flow as an "intermittent" stream in the spring as snowpack at higher elevations melts.   In another year, snowpack might be insubstantial, and the same tributary stream might flow only as an "ephemeral" stream in response to late summer storm events.  Both of these years might be a "typical year" in the watershed of the stream, and each year's flow pattern might occur repeatedly over a thirty-year period.  Such flow regimes are common in the western United States, and particularly so in New Mexico.   Moreover, for many tributary streams, such data might not be available for thirty years, or even for thirty months.   This distinction between "ephemeral" streams and "intermittent" streams will create tremendous confusion and uncertainty.  The agencies do not provide a reasoned explanation for this change in policy.

30

86.     The "typical year" construct is flawed in myriad other ways.  First, for example, the Agencies claim that the "typical year" construct "*provide[s] a predictable framework* to establish federal jurisdiction."  85 Fed. Reg. at 22,274 (emphasis added).  Yet the Agencies provide no underlying principle to guide agency discretion; they inadequately account for changing climate conditions; and they insert case-by-case analyses for nearly every jurisdictional determination.  Second, the Agencies describe a "typical year" as having precipitation between the "30th and 70th percentiles for totals from the same date range over the preceding 30 years." 85 Fed. Reg. at 22,311.  But the Agencies do not explain how the appropriate periodic range or statistical percentiles should be selected.  Third, the Agencies apparently do not know which tools they will use to assess stream flow to determine tributary classification.  They admit that they "may need to use the multiple tools to determine" whether a tributary is jurisdictional.  85 Fed. Reg. at 22,295.  These tools might include drought indices, web-based models, wetland climate analysis tables, Natural Resources Conservation Service soil maps, topographic data, aerial photographs, and other unidentified data sources.  *Id.* at 22,293–95, 22,274–75.  Yet the Agencies state that they "expect that landowners will *often* have sufficient knowledge to understand how water moves through their properties" to determine jurisdiction and *will not need to contact local, state, or federal authorities*.  85 Fed. Reg. at 22,293 (emphasis added).

87.     The Replacement Rule excludes all wetlands unless they abut (i.e., touch) jurisdictional waters, are inundated by flooding of jurisdictional waters, or are separated from jurisdictional waters only by a natural bank or berm or by an artificial barrier that allows a direct hydrological surface connection.  85 Fed. Reg. at 22,338 (codified at 33 C.F.R. § 328.3(c)(1), 40 C.F.R. § 120.2(3)(i)).  The Replacement Rule excludes many adjacent wetlands that, although

31

not in the annual floodplain, have a "significant nexus" to jurisdictional waters, as the Agencies previously recognized.  *See* Clean Water Rule, 80 Fed. Reg. at 37,603; Science Report at ES-3 to ES-4.  These wetlands help sustain the chemical, physical, and biological integrity of those connected jurisdictional waters.  The Agencies do not provide a reasoned explanation for this change in policy.

88.     The Replacement Rule removes interstate waters, including interstate wetlands, from the definition of "waters of the United States."  85 Fed. Reg. at 22282-83.  The agencies do not provide a reasoned explanation for this change in policy.

89.     In promulgating the Replacement Rule, EPA and the Corps disregard science. For example, the agencies disregard the conclusions of the Science Report, which found that ephemeral tributaries and many wetlands, both within and outside of the floodplain, have a "significant nexus" to downstream jurisdictional waters and help sustain the chemical, physical, and biological integrity of those downstream waters.  The agencies do not adequately explain how the decisions to exclude all ephemeral streams and many adjacent wetlands are supported by evidence in the record.  The agencies state merely that "science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the [Clean Water Act]."  85 Fed. Reg. at 22,288.  The Agencies disregard the primary objective of the Act – to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a) – which demands a scientific, ecological inquiry.

90.     In promulgating the Replacement Rule, EPA and the Corps do not consider effects of the Replacement Rule on water quality.  For example, by excluding all ephemeral

streams from Clean Water Act jurisdiction and protection, and by excluding many adjacent or otherwise connected wetlands from Clean Water Act jurisdiction and protection, water quality in many "waters of the United States" will become degraded.  Yet the agencies do not consider this important issue at all.

91.     In promulgating the Replacement Rule, which changes agency policy substantially, EPA and the Corps do not adequately consider the adverse effects of the rule on those who have relied on the Agencies' prior policy.  For example, many states and tribes – including New Mexico – have, in reliance on Federal permit programs under the Clean Water Act, not adopted state or tribal permit programs.  Moreover, many states and tribes rely on the Clean Water Act to protect their waters from degradation from upstream states.  Countless other persons and entities rely on the Clean Water Act to protect the quality and the physical, chemical, and biological integrity of waters that they use for business, agriculture, recreation, and consumption.  They include property owners, farmers and ranchers, the fishing industry, the shellfish industry, the outdoor recreation industry, fishermen and women, swimmers, river rafters, canoeists and kayakers, other outdoor enthusiasts, companies that restore streams and wetlands, and drinking water utilities.

92.     In promulgating the Replacement Rule, EPA and the Corps do not adequately consider effects of the rule on states or tribes that have not received authorization to implement the Clean Water Act permit programs.  For example, three states – including New Mexico – do not have permit programs for the discharge of pollutants into surface waters.  And 48 states – including New Mexico – do not have permit programs for the discharge of dredge and fill material into surface waters.  Consequently, as EPA and the Corps roll back the scope of their

jurisdiction under the Clean Water Act, in many cases there will be no state or tribal programs to fill the regulatory void. The Agencies "acknowledge that States without comprehensive pre-existing programs that seek to regulate waters no longer jurisdictional under this final rule may incur new costs and administrative burdens." 85 Fed. Reg. at 22,270. The Agencies also recognize that some tribes "may currently lack the capacity to create a tribal water program, to administer a program, or to expand programs that currently exist, and may rely on the Federal government for enforcement of water quality violations." But the Agencies offer no evaluation or solutions, except to note that states and tribes have the option to regulate non-jurisdictional waters. *Id.*

93.     In promulgating the Replacement Rule, EPA and the Corps do not consider the effects of global climate change. For example, climate scientists predict that the southwestern United States will become warmer (more evaporation) and drier (less precipitation) in coming decades. Moreover, a larger proportion of annual precipitation will fall in summer rainstorms, and a lesser proportion will fall in winter snow. Mountain snowpack, the source of most perennial streams, will decline. Summer rainstorms, the source of most ephemeral streams, will increase. These shifts in climate will increasingly cause currently intermittent streams to become ephemeral. Fewer and fewer tributary streams in the southwest will be subject to Clean Water Act jurisdiction and protection. Yet the Agencies do not discuss this important issue at all.

## VII.  INTERESTS OF THE WATER GROUPS

### A.  AMIGOS BRAVOS

94.     Amigos Bravos has a concrete interest in the rulemaking proceeding leading to the Replacement Rule.

95.     The Articles of Incorporation of Amigos Bravos state that the mission of the organization "is to return New Mexico's rivers and the Rio Grande watershed to drinkable quality wherever possible, and to contact quality everywhere else; to see that natural flows are maintained and where those flows have been disrupted by human intervention, to see that they are regulated to protect and reclaim the river ecosystem by approximating natural flows, while maintaining environmentally sound, sustainable practices of indigenous cultures."   Arts. of Incorporation of Amigos Bravos, Inc., art. III.A.  The Article of Incorporation of Amigos Bravos further states that to promote these objectives, Amigos Bravos will, among other things, "advocate for the restoration and protection of New Mexico's rivers and the Rio Grande watershed." *Id.* art. III.B.

96.     On April 15, 2019, Amigos Bravos, together with the New Mexico Environmental Law Center, submitted comments to EPA and the Corps on the Proposed Replacement Rule. EPA Docket ID No. EPA-HQ-OW-2018-0149-4921.  On April 15, 2019, Amigos Bravos, along with fifty-one other environmental, community, and conservation organizations and the Village of Questa, New Mexico, submitted separate comments to the agencies on the Proposed Replacement Rule.  EPA Docket ID No. EPA-HQ-OW-2018-0149-4636.

97.     Amigos Bravos has participated in many administrative proceedings under the Clean Water Act, including the "triennial review" of New Mexico water quality standards, certification of federal permits under section 401 of the Clean Water Act, and the issuance of NPDES permits to discharging facilities in New Mexico.  Amigos Bravos has also participated in state proceedings to set protocols for determining the hydrology of the state's waters.

98.     Amigos Bravos has submitted comments to EPA and the Corps on many proposed rulemakings under the Clean Water Act, including: EPA, Updated Regulations on Water Quality Certification, 84 Fed. Reg. 44,080 (Aug. 22, 2019) (proposed rule).   Amigos Bravos has participated in state proceedings to set protocols for determining the hydrology of the State's waters.

99.     Amigos Bravos engages with our membership in numerous educational programs, many of which occur along the rivers of New Mexico.   For example, for 15 years Amigos Bravos has led a volunteer water quality monitoring program that trains volunteers in water quality monitoring and collects samples in six New Mexico streams.   Amigos Bravos also hosts an annual river celebration that includes educational programs, fishing demonstrations, and raft trips for members and supporters.

100.    Amigos Bravos members use water from rivers and streams for irrigating crops and watering livestock.   Amigos Bravos members operate businesses, such as river rafting outfitters and fly-fishing guides, that depend on clean rivers and streams and other surface waters.

101.    Amigos Bravos members engage in fishing, swimming, river rafting, canoeing and kayaking, and other recreational activities that depend on clean rivers and streams and other surface waters.

102.    Some Amigos Bravos members live in Santa Fe, New Mexico and obtain their drinking water, in part, from the Buckman Direct Diversion Project on the Rio Grande.   The Buckman Diversion is a major source of water for the Santa Fe municipal water supply located immediately downstream from Los Alamos National Laboratory.   The Laboratory has several

NPDES permits that allow it to discharge pollutants from over 400 separate outfalls into canyon streams on the Pajarito Plateau.  The streams, most of which are ephemeral or intermittent, flow into the Rio Grande immediately upstream of the Buckman Diversion.  If these tributaries lose Clean Water Act protection, Santa Fe members who obtain their water from the municipal water system are likely to suffer from degraded drinking water or higher utility bills, or both.

103.    If Clean Water Act permitting requirements and other protections no longer apply to discharges into ephemeral tributary streams, Amigos Bravos and its members will suffer substantial harm.  Unregulated discharges into ephemeral tributaries from mining operations, oil and gas production, Federal military and nuclear facilities, municipal sewage treatment plants, and construction sites, among others, will likely increase.  Water quality will be degraded in the ephemeral streams and in downstream waters throughout New Mexico.  And Amigos Bravos will be forced to redirect its limited resources to monitoring discharges into ephemeral streams that are no longer subject to Clean Water Act permit requirements.

104.    Amigos Bravos is a person that has been "adversely affected or aggrieved" by the action of EPA and the Corps in promulgating the Replacement Rule within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.  Individual members of Amigos Bravos are also persons that have been "adversely affected or aggrieved" by the action of EPA and the Corps in promulgating the Replacement Rule within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.

**B.  NEW MEXICO ACEQUIA ASSOCIATION**

105.    The New Mexico Acequia Association has a concrete interest in the rulemaking proceeding leading to the Replacement Rule.

37

106.     The Bylaws of the New Mexico Acequia Association state that the purpose of the Association "is to protect and strengthen community acequias."  Further, the Association works "to defend Acequia water rights, protect water as a community resource, and sustain our farming and ranching traditions."  Restated Bylaws of the N.M. Acequia Ass'n, art. IV.a. (Dec. 6, 2008). The Bylaws state that among the specific goals of the Association are to "protect and manage local water rights for agricultural and other community needs, and to "increase the cultivation of locally grown foods through education and financial support of small-scale farmers and ranchers."  *Id.* art. IV.a.i, ii.

107.     The New Mexico Acequia Association, 2010 Congreso de las Acequias, Statement of Core Values, states, "We view water as a *don divino* or a devine gift from God and as a common resource that sustains all life."  *Id.* ¶ 3.  It further states, "Water rights should remain connected to the acequias to nurture agricultural traditions, to replenish aquifers, and to support the green ribbons of life along our rivers."  *Id.* ¶ 4.  And it also states, "We respect the traditional knowledge of our elders which guides the day-to-day operation of aceqias, the cultivation of ancestral crops, and the care of our animals.  The *querencia* we inherited includes the love of our land, water, and community."  *Id.* ¶ 5.

108.     On April 15, 2019, the New Mexico Acequia Association submitted comments to EPA and the Corps on the Proposed Replacement Rule.  EPA Docket ID No. EPA-HQ-OW-2018-0149-4988.

109.     In furtherance of its mission to protect New Mexico's water for its members and the general public, the New Mexico Acequia Association is a co-petitioner in an application to the New Mexico Water Quality Control Commission to designate a stretch of the Pecos River as

an Outstanding National Resource Water.  The New Mexico Acequia Association has been engaged for a number of years in litigation over the administrative review of United States Department of Energy permits in order to ensure that discharges from the Los Alamos National Laboratory are adequately monitored and regulated.  The New Mexico Acequia Association has submitted comments or otherwise engaged in numerous proceedings at all levels of government – local, state and federal – including in the drafting of local land use ordinances, reviewing municipal wastewater treatment facility NPDES permits, and participating in the NEPA[2] process for mining applications on federal land.

110.    The New Mexico Acequia Association has several long-standing programs aimed at protecting New Mexico's acequias including a governance project focused on strengthening capacity in local leaders to manage water in acequia communities, a farmer-training program devoted to increasing the number of farmers in New Mexico, and a youth education program geared toward teaching youth about the importance of acequias to the history, culture, and economy of New Mexico.

111.    New Mexico Acequia Association members include community ditch associations, acequias, regional acequias, and *parciante* members who are individual irrigators and members of an acequia.  The acequias are comprised of small farmers and ranchers.  They rely on clean water for irrigation of crops and watering of livestock; for ecological, cultural, and aesthetic benefits; and for groundwater recharge of aquifers for domestic and community wells. The New Mexico Acequia Association members divert water for irrigation and livestock watering from streams in twenty-three of New Mexico's thirty-two counties.  These streams are

---

[2] The National Environmental Policy Act, 42 U.S.C. §§ 4321 to 4370h.

perennial, intermittent, ephemeral, or interstate and rely on snowpack or precipitation and storm events to contribute to their flow.  The New Mexico Acequia Association members include organic farmers and farmers that sell produce to New Mexico's schools or at New Mexico's farmers markets.  Many of the New Mexico Acequia Association's members rely on their crops to supplement their income or otherwise rely on their crops to supplement their food needs.

112.    If Clean Water Act permitting requirements and other protections no longer apply to discharges into ephemeral tributary streams, the New Mexico Acequia Association and its members will suffer substantial harm.  Unregulated discharges into ephemeral tributaries from mining operations, Federal nuclear facilities, municipal sewage treatment plants, and construction sites, among others, will likely increase.  Water quality will be degraded in the ephemeral streams and in downstream waters throughout New Mexico to the detriment of the acequias and their members.

113.    The New Mexico Acequia Association is a person that has been "adversely affected or aggrieved" by the action of EPA and the Corps in promulgating the Replacement Rule within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.   Individual members of the New Mexico Acequia Association are also persons that have been "adversely affected or aggrieved" by the action of EPA and the Corps in promulgating the Replacement Rule within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.

**C.  GILA RESOURCES INFORMATION PROJECT**

114.    The Gila Resources Information Project has a concrete interest in the rulemaking proceeding leading to the Replacement Rule.

115.    The Articles of Incorporation of the Gila Resources Information Project state: "Recognizing that human and environmental systems are inseparable and interdependent, Gi1a Resources Information Project pursues two goals: To protect and nurture human communities by safeguarding the natural resources that sustain us all; and to safeguard natural resources by facilitating informed public participation in resource use decisions."  Gila Resources Information Project Articles of Incorporation, art. III (Nov. 25, 1997).

116.    The mission of the Gila Resources Information Project is protecting the environment and natural resources of southwest New Mexico, including protecting surface water and groundwater.  The organization has advocated for protection of surface water and groundwater and for free-flowing rivers.

117.    The Gila Resources Information Project engages in various activities to promote water conservation, including public outreach, education, and advocacy.  These activities include publishing a newsletter, communicating with members via a website, e-mail, and social media, offering community meetings, issuing press releases, placing display advertisements, and encouraging and facilitating public participation in regulatory deliberations regarding water quality in southwest New Mexico.  The Gila Resources Information Project organizes the annual Gila River Festival, now in its 16th year.  Festival activities include kayaking trips, fishing workshops, and educational programming.

118.    The Gila Resources Information Project is active in legal and regulatory proceedings before federal and state government agencies that affect water and water quality in New Mexico.

41

119.    On April 15, 2019, the Gila Resources Information Project, along with fifty-one other environmental, community, and conservation organizations and the Village of Questa, New Mexico, submitted comments to EPA and the Corps on the Proposed Replacement Rule.  EPA Docket ID No. EPA-HQ-OW-2018-0149-4636.

120.    For the past 20 years, the Gila Resources Information Project has participated in numerous administrative proceedings before the New Mexico Environment Department and the New Mexico Water Quality Control Commission involving water quality.  For example, the organization has participated as a party in administrative proceedings involving groundwater discharge permits under the New Mexico Water Quality Act for the Freeport-McMoRan (formerly Phelps Dodge) Tyrone Milne in Grant County, New Mexico, the Freeport-McMoRan Chino Mine, also in Grant County, and the Copper Flat Mine in Sierra County, New Mexico. The Gila Resources Information Project has also been a party to appeals of groundwater discharge permits for the Tyrone and Copper Flat mines to the New Mexico Court of Appeals.

121.    For the past 17 years, the Gila Resources Information Project has been one of the organizations leading the effort to keep the Gila River a free-flowing river.

122.    Gila Resources Information Project has established a Water Resources Protection Program that promotes water quality and water supply protection, including education of community members about water quality protection and water conservation, participation in local and regional water planning, and facilitation of community participation in public processes related to water resources protection. Through its Silver City Watershed Keepers initiative, Gila Resources Information Project educates and trains volunteer citizen scientists to monitor water quality and steward the area's water resources.

123.    Gila Resources Information Project members engage in fishing, swimming, boating, and other recreational activities that depend on clean rivers and streams and other surface waters.

124.    Most members of the Gila Resources Information Project live in southwestern New Mexico.  Gila Resources Information Project members use and enjoy the rivers, streams, lakes, and other waters in southwest New Mexico for irrigation, livestock watering, fishing, river rafting, kayaking and canoeing, inner-tubing, swimming, photography, hiking, bird watching, picnicking, and other recreation, educational and aesthetic interests.

125.    If Clean Water Act permitting requirements and other protections no longer apply to discharges into ephemeral tributary streams, the Gila Resources Information Project and its members will suffer substantial harm.  Unregulated discharges into ephemeral tributaries from mining operations, oil and gas production, municipal sewage treatment plants, and construction sites, among others, will likely increase.  Water quality will be degraded in the ephemeral streams and in downstream waters throughout New Mexico.

126.    The Gila Resources Information Project is a person that has been "adversely affected or aggrieved" by the action of EPA and the Corps in promulgating the Replacement Rule within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.  Individual members of the Gila Resources Information Project are also persons that have been "adversely affected or aggrieved" by the action of EPA and the Corps in promulgating the Replacement Rule within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.

43

**FIRST CLAIM FOR RELIEF:**
**DEFENDANTS' EXCLUSION OF ALL EPHEMERAL FEATURES**
**FROM THE DEFINITION OF "WATERS OF THE UNITED STATES" IS**
**ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION,**
**AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

127.    The Water Groups incorporate Paragraphs 1 through 126 above as if fully set forth herein.

128.    The express objective of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The exclusion of all ephemeral features, including ephemeral streams, from the definition of "waters of the United States" under the Replacement Rule, which excludes from Clean Water Act jurisdiction and protection many ephemeral streams that have historically been understood to be jurisdictional waters, is not in accordance with the Clean Water Act.

129.    Decisions of the United States Supreme Court are binding on all Federal agencies. *See United States v. Nixon*, 418 U.S. 683, 703 (1974) ("it is emphatically the province and duty of the judicial department to say what the law is.").  Justice Kennedy's controlling opinion in *United States v. Rapanos* established the "significant nexus" test for determining whether a water is jurisdictional under the Clean Water Act.  A majority of the Supreme Court agreed that Clean Water Act jurisdiction extends to streams, including ephemeral streams, that satisfy the "significant nexus" test.  The exclusion of all ephemeral features, including ephemeral streams, from the definition of "waters of the United States" under the Replacement Rule is not in accordance with the Supreme Court decision in *Rapanos*.

130.    In an agency rulemaking, "[t]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the

44

facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. –, 136 S.Ct. 2117, 2126 (2016).   In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for excluding all ephemeral features, including ephemeral streams, from the definition of "waters of the United States."

132.    In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for making the unworkable and scientifically-unsupported distinction between "intermittent streams" and "ephemeral streams."

131.    In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for basing the distinction between "intermittent" and "ephemeral" streams on an indeterminate and ill-defined "typical year."

133.    An agency that promulgates a rule that revises or reverses its long-standing policy or practice must articulate a reasoned explanation and rational basis for the new policy.   *Encino Motorcars,* 136 S.Ct. at 2126; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The exclusion of all ephemeral features, including ephemeral streams, from the definition of "waters of the United States" under the Replacement Rule is a major change in agency policy.   In promulgating the Replacement Rule, EPA and the Corps have not articulated a reasoned explanation for this new policy.

134.    An agency that promulgates a rule that revises or reverses its long-standing policy or practice must consider and evaluate the reliance interests engendered by the agency's prior position. *Encino Motorcars*, 136 S.Ct. at 2126; *Fox Television Stations*, 556 U.S. at 515.   The exclusion of all ephemeral features, including ephemeral streams, from the definition of "waters of the United States" under the Replacement Rule is a major change in agency policy.   In

promulgating the Replacement Rule, EPA and the Corps have neither considered nor evaluated the reliance that persons or entities may have placed on the agencies' prior position.

135.    An agency action is "arbitrary and capricious" if the agency has "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The effect on water quality of excluding all ephemeral features, including ephemeral streams, from Clean Water Act jurisdiction is a critically important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps entirely failed to consider the effect of that exclusion on the Nation's water quality.

136.    The effects that excluding all ephemeral features, including ephemeral streams, from Clean Water Act jurisdiction will have on states and Tribes that do not have authorized discharge permit programs is an important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps failed adequately to consider the effect of that exclusion on these states and Tribes.

137.    The effects of changing climate on excluding all ephemeral features, including ephemeral streams, from Clean Water Act jurisdiction is a critically important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps entirely failed to consider the effect of changing climate.

138.    An agency action is "arbitrary and capricious" if the agency "has offered an explanation for its decision that runs counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.  In promulgating the Replacement Rule, EPA and the Corps offered an explanation for excluding all ephemeral features, including ephemeral streams, from Clean

Water Act jurisdiction that runs counter to the scientific and other evidence before the agencies. *See, e.g.*, Science Report at ES-2 to ES-4.

139.    An agency action is arbitrary and capricious if it violates the basic premise that "[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996). "Intermittent" and "ephemeral" streams perform similar functions and provide similar benefits to downstream jurisdictional waters. In promulgating the Replacement Rule, EPA and the Corps treat "intermittent" and "ephemeral" streams in a dissimilar manner without a legitimate reason for doing so.

140.    For all of these reasons, the Replacement Rule's exclusion of all ephemeral features, including ephemeral streams, from the definition of "waters of the United States" under the Clean Water Act is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law' within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF:
### DEFENDANTS' EXCLUSION OF MANY ADJACENT WETLANDS FROM THE DEFINITION OF "WATERS OF THE UNITED STATES" IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW

141.    The Water Groups incorporate Paragraphs 1 through 126 above as if fully set forth herein.

142.    The express objective of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The exclusion of many wetlands having a "significant nexus" to jurisdictional waters from the

definition of "waters of the United States" under the Replacement Rule, which excludes from Clean Water Act jurisdiction and protection many wetlands that have historically been understood to be jurisdictional waters, is not in accordance with the Clean Water Act.

143.    Decisions of the United States Supreme Court are binding on all Federal agencies. *See United States v. Nixon*, 418 U.S. 683, 703 (1974) ("it is emphatically the province and duty of the judicial department to say what the law is.").   Justice Kennedy's controlling opinion in *United States v. Rapanos* established the "significant nexus" test for determining whether a water is jurisdictional under the Clean Water Act.   A majority of the Supreme Court agrees that Clean Water Act jurisdiction extends to wetlands that satisfy the "significant nexus" test.   The exclusion of many wetlands having a "significant nexus" to jurisdictional waters from the definition of "waters of the United States" under the Replacement Rule is not in accordance with the Supreme Court decision in *Rapanos*.

144.    In an agency rulemaking, "[t]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."   *Encino Motorcars, LLC v. Navarro*, 579 U.S. –, 136 S.Ct. 2117, 2126 (2016).   In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for excluding many wetlands having a "significant nexus" to jurisdictional waters from the definition of "waters of the United States."

145.    In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for creating an illogically and inconsistently restrictive definition of "adjacent wetlands."

48

146.    In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for basing part of the definition of "adjacent wetlands" on flooding during an indeterminate and ill-defined "typical year."

147.    An agency that promulgates a rule that revises or reverses its long-standing policy or practice must articulate a reasoned explanation and rational basis for the new policy.  *Encino Motorcars*, 136 S.Ct. at 2126; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The exclusion of many wetlands having a "significant nexus" to jurisdictional waters from the definition of "waters of the United States" under the Replacement Rule is a major change in agency policy.  In promulgating the Replacement Rule, EPA and the Corps have not articulated a reasoned explanation for this new policy.

148.    An agency that promulgates a rule that revises or reverses its long-standing policy or practice must consider and evaluate the reliance interests engendered by the agency's prior position.  *Encino Motorcars*, 136 S.Ct. at 2126; *Fox Television Stations*, 556 U.S. at 515.  The exclusion of many wetlands having a "significant nexus" to jurisdictional waters from the definition of "waters of the United States" under the Replacement Rule is a major change in agency policy.  In promulgating the Replacement Rule, EPA and the Corps have neither considered nor evaluated the reliance that persons or entities may have placed on the agencies' prior position.

149.    An agency action is "arbitrary and capricious" if the agency has "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The effects on water quality of excluding many wetlands having a "significant nexus" to jurisdictional waters from Clean Water Act jurisdiction is a

critically important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps entirely failed to consider the effect of that exclusion on the Nation's water quality.

150.   The effects that excluding from jurisdiction many wetlands with a "significant nexus" to jurisdictional waters will have on states and tribes that do not have authorized discharge permit programs is an important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps failed adequately to consider the effect of that exclusion on these states and tribes.

151.   The effects of changing climate on excluding many wetlands having a "significant nexus" to jurisdictional waters from Clean Water Act jurisdiction is a critically important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps entirely failed to consider the effect of changing climate.

152.   An agency action is "arbitrary and capricious" if the agency "has offered an explanation for its decision that runs counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.   In promulgating the Replacement Rule, EPA and the Corps offered an explanation for excluding many wetlands having a "significant nexus" to jurisdictional waters from Clean Water Act jurisdiction that runs counter to the scientific and other evidence before the agencies.

153.   An agency action is arbitrary and capricious if it violates the basic premise that "[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).   Many wetlands having a "significant nexus" to jurisdictional waters that are

excluded from the definition of "waters of the United States" perform similar functions and provide similar benefits to downstream jurisdictional waters as those wetlands included in the definition.  Examples include wetlands that are *flooded by*, or *flood into*, jurisdictional waters; wetlands that are *within*, or *outside of*, the floodplain; and wetlands that are separated from jurisdiction waters by a *natural*, or an *artificial*, bank, berm, or other barrier.  In promulgating the Replacement Rule, EPA and the Corps treat these wetlands in a dissimilar manner without a legitimate reason for doing so.

154.    For all of these reasons, the Replacement Rule's exclusion of many wetlands having a "significant nexus" to jurisdictional waters from the definition of "waters of the United States" under the Clean Water Act is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law' within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF:
### DEFENDANTS' REMOVAL OF INTERSTATE WATERS
### FROM THE DEFINITION OF "WATERS OF THE UNITED STATES" IS
### ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION,
### AND OTHERWISE NOT IN ACCORDANCE WITH LAW

155.    The Water Groups incorporate Paragraphs 1 through 126 above as if fully set forth herein.

156.    The express objective of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The removal of interstate waters from the definition of "waters of the United States" under the Replacement Rule, which excludes from Clean Water Act jurisdiction and protection many

interstate waters that have historically been understood to be jurisdictional waters, is not in accordance with the Clean Water Act.

157.    In an agency rulemaking, "[t]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. –, 136 S.Ct. 2117, 2126 (2016).   In promulgating the Replacement Rule, EPA and the Corps have not articulated a satisfactory explanation for removing interstate waters from the definition of "waters of the United States."

158.    An agency that promulgates a rule that revises or reverses its long-standing policy or practice must articulate a reasoned explanation and rational basis for the new policy. *Encino Motorcars*, 136 S.Ct. at 2126; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The removal of interstate waters from the definition of "waters of the United States" under the Replacement Rule is a major change in agency policy.   In promulgating the Replacement Rule, EPA and the Corps have not articulated a reasoned explanation for this new policy.

159.    An agency that promulgates a rule that revises or reverses its long-standing policy or practice must consider and evaluate the reliance interests engendered by the agency's prior position. *Encino Motorcars*, 136 S.Ct. at 2126; *Fox Television Stations*, 556 U.S. at 515.   The removal of interstate waters from the definition of "waters of the United States" under the Replacement Rule is a major change in agency policy.   In promulgating the Replacement Rule, EPA and the Corps have neither considered nor evaluated the reliance that persons or entities may have placed on the agencies' prior position.

160.    An agency action is "arbitrary and capricious" if the agency has "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The effects on water quality of removing interstate waters from Clean Water Act jurisdiction is a critically important aspect of defining "waters of the United States."  In promulgating the Replacement Rule, EPA and the Corps entirely failed to consider the effect of that exclusion on the Nation's water quality.

161.    For all of these reasons, the Replacement Rule's removal of interstate waters from the definition of "waters of the United States" under the Clean Water Act is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law' within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF:
## DEFENDANTS DID NOT OBSERVE PROCEDURES REQUIRED BY LAW

162.    The Water Groups incorporate Paragraphs 1 through 161 above as if fully set forth herein.

163.    In an agency rulemaking, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and must give "consideration of the relevant matter presented" in public comments.  5 U.S.C. § 553(c).

164.    The opportunity for comment during an agency rulemaking must be meaningful. The agency must provide the reasoning for its proposed rulemaking, and there must be enough time for the public to comment.  "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties

will not be able to comment meaningfully upon the agency's proposals." *Connecticut Light and Power v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982)

165.    When a proposed regulation is aimed at eliminating protections that were previously adopted by an agency, notice and comment also "ensures that . . . [the] agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of [the removal of protections]." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982)

166.    The Replacement Rule reverses decades of law and agency practice.  But the Replacement Rule, and the Proposed Replacement Rule that preceded it, lacked any meaningful, reasoned explanation for the agencies' departure from prior policy.  EPA and the Corps did not provide a meaningful opportunity for the public to comment on the Replacement Rule or the proposed rule.

167.    The Proposed Replacement Rule was extremely complex, solicited comment on a large number of issues, and proposed to reverse decades of agency policy on issues of great importance.  Consequently, many commenters requested an extension of the sixty-day public comment period.  The Agencies did not grant the requests; the Agencies accepted comment on the proposed rule for only sixty days.  Sixty days was not adequate time for the public to comment meaningfully on the proposed rule.

168.    For all of these reasons, the Replacement Rule was promulgation "without observance of procedures required by law" within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2)(D).

**PRAYER FOR RELIEF**

The Water Groups respectfully request that this Court:

1.     Declare that the final action of EPA and the Corps in promulgating the challenged Replacement Rule, The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020), was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, contrary to the Administrative Procedure Act and the Clean Water Act;

2.     Declare that the final action of EPA and the Corps in promulgating the challenged Replacement Rule was without observance of procedure required by law, contrary to the Administrative Procedure Act;

3.     Vacate and set aside the challenged Replacement Rule;

4.     Award the Water Groups their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

5.     Grant the Water Groups such further and additional relief as the Court may deem just and proper.

Respectfully submitted,                              June 30, 2020

Charles de Saillan                          Enrique Romero
Douglas Meiklejohn                          New Mexico Acequia Association
Eric Jantz                                  805 Early Street
New Mexico Environmental Law CenterSuite B203
1405 Luisa Street, Suite 5                  Santa Fe, New Mexico  87505
Santa Fe, New Mexico  87505                 Telephone: (505) 995-9644
Telephone: (505) 989-9022                   enrique@lasacequias.org
cdesaillan@nmelc.org                        *Counsel for the New Mexico Acequia*
dmeiklejohn@nmelc.org                       *Association*
ejantz@nmelc.org
*Counsel for the Water Conservation Groups*

J. Blanding Holman IV*                      Megan Hinkle Huynh*
Southern Environmental Law Center           Southern Environmental Law Center
bholman@selcsc.org                          mhuynh@selcga.org
525 East Bay Street                         Ten 10th Street NW, Suite 1050
Charleston, SC 29403                        Atlanta, GA 30309
Telephone: (843) 720-5270                   Telephone: (404) 521-9900
*Counsel for Amigos Bravos*                 *Counsel for Amigos Bravos*

*pro hac vice* applications forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 30, 2020, I electronically filed the foregoing Cross Complaint for

Declaratory and Injunctive Relief with the Clerk of Court using the CM/ECF system, which

will send notification of this filing to the attorneys of record.

57