**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

NEW MEXICO CATTLE GROWERS'          )
ASSOCIATION,                        )
                                    )
Plaintiff,                          )
                                    )          **No. 1:19–CV–00988–RB–SCY**
v.                                  )
                                    )
UNITED STATES ENVIRONMENTAL         )
PROTECTION AGENCY, et al.,          )
                                    )
Defendants,                         )
                                    )
    and             )
                                    )
AMIGOS BRAVOS, NEW MEXICO           )
ACEQUIA ASSOCIATION, and GILA       )
RESOURCES INFORMATION               )
PROJECT,                            )
                                    )
  Intervening Cross-claimants-Defendants,)
                                    )
    v.              )
                                    )
UNITED STATES ENVIRONMENTAL         )
PROTECTION AGENCY, et al.,          )
                                    )
Cross-Defendants.                   )
_____ )

**WATER GROUPS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

LEGAL BACKGROUND ............................................................................................. 2

   I.   The Clean Water Act and "Waters of the United States" ..................................... 2

   II.  Regulatory History ............................................................................................... 5

        a.   The *Rapanos* Guidance and 1980s Regulations ........................................... 6

        b.   The Clean Water Rule ................................................................................... 6

        c.   The Agencies' Unlawful Efforts to Suspend and Repeal the Clean Water Rule ........... 8

        d.   The Agencies' Unlawful Replacement Rule .................................................. 10

PROCEDURAL BACKGROUND ................................................................................ 12

STANDARD OF REVIEW .......................................................................................... 13

ARGUMENT ............................................................................................................... 14

   I.   Plaintiff Will Not Succeed on the Merits .......................................................... 14

        a.   Plaintiff Supported Federal Regulation of Intermittent Tributaries and Non-Abutting Wetlands in its Public Comments During the Replacement Rulemaking ..................... 14

        b.   The Tenth Circuit's Significant Nexus Test Forecloses Plaintiff's Arguments ............. 15

        c.   *Rapanos* Reaffirmed the Significant Nexus Test ........................................... 17

           i.   The "Narrowest Ground" Circuits ........................................................... 18

           ii.  The "Majority Votes" Circuits .................................................................. 20

        d.   The Supreme Court Has Not Recognized Justice Scalia's Plurality Opinion as the Holding of *Rapanos* ..................................................................... 23

        e.   Plaintiff's Arguments Are Meritless No Matter Which Standard Applies .................... 25

           i.   The Significant Nexus Test ........................................................................ 25

      ii.  Justice Scalia's Test ................................................................................. 27

II.  Plaintiff Has Not Shown Harm, Much Less Irreparable Harm............................... 29

    a.  Given Its Four-Decade-Long Delay in Seeking Relief, Plaintiff Cannot Credibly Claim that Any Harm Is Serious Enough to Justify a Preliminary Injunction............... 29

    b.  Plaintiff's Comments Undercut Its Claim of Immediate, Irreparable Harm ................. 30

    c.  Plaintiff Has Not Been Deprived of Any Constitutional Right ..................................... 31

    d.  Plaintiff's Declaration Do Not Show Harm................................................................. 33

III. A Preliminary Injunction Is Not in the Public Interest ......................................... 34

IV. The Balance of Equities Weighs Decisively against Preliminary Injunctive Relief ........... 35

CONCLUSION...................................................................................................... 35

## INTRODUCTION

Proposed Intervenors Amigos Bravos, New Mexico Acequia Association, and Gila Resources Information Project oppose Plaintiff New Mexico Cattle Growers' Association's Motion for Preliminary Injunction, Doc. 30. Plaintiff does not satisfy a single factor needed to obtain a preliminary injunction: its merits arguments would rewrite half a century of law and are nearly certain to fail; it faces no imminent harm; and it seeks to upset the status quo in a way that injures the public interest in water quality.

The regulation that Plaintiff challenges imposes unprecedented restrictions on the scope of "waters of the United States" regulated under the Clean Water Act. Among other things, the so-called "Navigable Waters Protection Rule"[1] strips the Act's protections from at least 5 million stream miles and tens of million acres of wetlands nationwide. *See* Dr. S. Mažeika Patricio Sullivan Decl., *California v. Wheeler*, 3:20-cv-03005-RS (N.D. Cal), ECF No. 30-18 ("Sullíván Decl."), at ¶¶ 3, 24, 34. In New Mexico, the Rule eliminates protections for up to 90 percent of the state's currently jurisdictional waters, which will "drastically and adversely impact the quality" of New Mexico's scarce water resources.[2] For example, the Rule eliminates protection for all ephemeral (i.e., rain-dependent) and some intermittent (e.g., seasonal) tributaries. These tributaries collectively provide drinking water for hundreds of thousands of New Mexicans.[3]

---

[1] Final Rule, "The Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" 85 Fed. Reg. 22,250 (April 21, 2020) ("Replacement Rule" or "Rule").

[2] New Mexico Environment Department, Comments on Proposed Rule Defining Scope of Waters Federally Regulated under the Clean Water Act at 6, 12, 14, Apr. 15, 2019, https://perma.cc/DA36-Z9QL (permanent link) ("NMED Comments").

[3] NMED Comments at 2, 3, 6, 8, 9, 14; *see also see also* EPA, Analysis of Surface Drinking Water Provided by Intermittent, Ephemeral, and Headwater Streams in the U.S. at 1, July 2009, https://perma.cc/SKG4-AFM7 (permanent link).

Incredibly, Plaintiff asserts that the Replacement Rule does not restrict federal authority enough. Plaintiff seeks to preliminarily enjoin the Agencies from regulating *any* tributaries that do not "flow[] continuously year round" or *any* wetlands that do not directly "abut" jurisdictional waters. Doc. 30 at 14–16. But the Agencies have regulated many such waters for over 40 years.

Despite its newly professed need for urgent relief, Plaintiff has waited *nearly a half century* to seek redress for its so-called injuries. And unlike a standard preliminary injunction (an extraordinary remedy in its own right), Plaintiff's injunction would not preserve the status quo, but would instead impose a state of affairs that has *never existed in the Act's history*—a form of preliminary relief that is heavily disfavored in the Tenth Circuit. On the merits, Plaintiff's extreme position has been rejected by all six circuit courts of appeal that have addressed it, and by the District of Colorado just last week. As for the public interest and the balance of harms, it is hard to imagine a more compelling public interest than ensuring safe, clean drinking water for hundreds of thousands of New Mexicans. For these reasons, and as set forth more fully below, Plaintiff cannot satisfy any of the factors required to obtain a preliminary injunction.

## LEGAL BACKGROUND

### I.     The Clean Water Act and "Waters of the United States"

By the 1970's, after decades of federal deference to state efforts, the nation's waters "[we]re in serious trouble, thanks to years of neglect, ignorance, and public indifference." H.R. Rep. No. 92-911, at 1 (1972). In 1972, a bipartisan Congress responded, passing the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act "incorporated a broad, systemic view of the goal of

2

maintaining and improving water quality," one that "demanded broad federal authority to control

pollution . . . ." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132, 133 (1985).

The Act's suite of water pollution controls[4] applies to "navigable waters," 33 U.S.C. §§

1311(a), 1362(12), which "Congress chose to define . . . broadly" as "the waters of the United

States." *Riverside Bayview*, 474 U.S. at 133; 33 U.S.C. § 1362(7). By defining "navigable

waters" as "waters of the United States," the Act "makes it clear that the term 'navigable' . . . is

of limited import." *Id.* at 133; H.R. Rep. No. 92-911, at 131 ("The Committee fully intends that

the term 'navigable waters' be given the broadest possible constitutional interpretation . . .").

Consistent with Congress' intent, the Supreme Court has repeatedly affirmed that the Act

protects many wetlands and streams that are not "navigable in fact." In *Riverside Bayview*, the

Court held that the Act extends to "adjacent wetlands"—those that "border [] or are in reasonable

proximity to other waters of the United States," so as to support an "ecological judgment . . . that

[the] wetlands may affect the water quality of adjacent lakes, rivers, and streams." 474 U.S. at

134. The Court noted that wetlands "may function as integral parts of the aquatic environment

even when the moisture creating the wetlands does not find its source in adjacent bodies of

water." *Id.* at 135. In *Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs* ("*SWANCC*"),

the Court reaffirmed that Clean Water Act jurisdiction extends to non-navigable waters with a

"significant nexus" to navigable waters. 531 U.S. 159, 167 (2001). Applying that standard, the

---

[4] Central to these protections is the Act's prohibition on the discharge of pollutants to navigable waters, i.e., "waters of the United States," without a permit. *See* 33 U.S.C. §§ 1311(a), 1342, 1344. When permitting requirements apply—that is, when there is a proposed discharge of a pollutant to "waters of the United States," *id.* § 1311(a)—the discharge may be prohibited entirely if it would undermine the goals of the Act, *e.g., id.* § 1342(a), and if permitted, is subject to "effluent limitations" on type, quantity, rate, and concentration of pollutants, *e.g., id.* §§ 1311(a), 1312, 1362(11), and in the case of dredged or fill material, must minimize and mitigate impacts to aquatic resources, *see e.g.*, 40 C.F.R. § 230.10(a), among other protections.

Court held that the Corps could not regulate an isolated, abandoned sand and gravel pit created for mining activities *solely* on the basis that it served as habitat for migratory birds. *Id.* In *United States v. Hubenka*, the Tenth Circuit applied the significant nexus test of *Riverside Bayview* and *SWANCC*, holding that the Act extends to all tributaries with "the potential for pollutants to migrate . . . to navigable waters[.]" 438 F.3d 1026, 1033–34 (10th Cir. 2006).

In *Rapanos v. United States*, the Court addressed whether the Act covers wetlands that "are not adjacent to waters that are navigable in fact." 547 U.S. 715, 759 (2006) (Kennedy, J., concurring). The Court split 4-1-4 over the appropriate legal standard for delineating the Act's jurisdiction, but five Justices held that the Act extends—at the very least—to non-navigable waters that have a "significant nexus" with navigable waters. *Id.* at 780, 787 (Kennedy, J., concurring); *id.* at 810 (Stevens, J., joined by three other Justices, dissenting).

Justice Kennedy concurred with the four-justice plurality authored by Justice Scalia solely in its judgment that the Court of Appeals "applied the wrong standard." *Id.* at 757 (Scalia, J., plurality op.); *id.* at 787 (Kennedy, J., concurring). As to the correct standard, Justices Kennedy and Scalia fundamentally disagreed, save for the uncontroversial point that the Act protects "something more than traditional navigable waters," *id.* at 731 (Scalia, J., plurality op.); *id.* at 767–69 (Kennedy, J., concurring). Justice Kennedy applied the "significant nexus" test of *Riverside Bayview* and *SWANCC* and held that wetlands and waters "come within the statutory phrase 'navigable waters'" if they, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as navigable." *Rapanos*, 547 U.S. at 759, 780. Justice Scalia relied on a selective reading of Webster's Dictionary, *e.g., id.* at 770–71 (Kennedy, J.,

concurring); *id.* at 801, 805 (Stevens, J., dissenting), and would restrict the Act to waters with "a continuous surface connection" to "relatively permanent, standing or continuously flowing bodies of water." *Id.* at 739, 742. Five members of the Court rejected Justice Scalia's limitations.

Justice Kennedy concluded that those limitations are "inconsistent with the Act's text, structure, and purpose," *id.* at 776, and "without support in . . . [the Court's] cases interpreting it," *id.* at 768. Writing for the Court's four remaining members in dissent, Justice Stevens noted the "plurality's dramatic departure from . . . *Riverside Bayview*," and that "no party or amicus ha[d] suggested either of" Justice Scalia's limitations. *Id.* at 800. The dissent found that both the plurality's and Justice Kennedy's opinions unduly infringed on federal authority under the Act, and at a minimum would affirm federal jurisdiction "in all . . . cases in which either the [Scalia or Kennedy] . . . test is satisfied." *Id.* at 809–10 (Stevens, J., dissenting). As a result, and as each of the six circuit courts to have considered the issue has held, *infra* note 17, waters that meet the significant nexus test are "waters of the United States," and waters need not satisfy Justice Scalia's test to qualify.

## II.    Regulatory History

Relevant here, the Agencies have interpreted "waters of the United States" to encompass intermittent[5] tributaries of navigable waters since the Act's infancy in 1973, *see* 38 Fed. Reg. 13,528, 13,529 (May 22, 1973) (codified at 40 C.F.R. § 125.1 (1973)) (regulating "[t]ributaries of navigable waters of the United States"), and have interpreted the phrase to include wetlands

---

[5] For purposes of this motion, there are three types of tributaries: (1) "perennial" tributaries, which "flow[] continuously year-round," (2) "intermittent" tributaries, which "flow[] continuously during certain times of the year and more than in direct response to precipitation... e.g., seasonally," and (3) "ephemeral" tributaries, which "flow[] or pool[] only in direct response to precipitation." *See* Replacement Rule, 85 Fed. Reg. at 22,338–39.

adjacent to, but that do not directly abut, navigable waters since at least 1977, *see* 42 Fed. Reg. 37,128 (1977) (regulating all "adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States"); *accord Riverside Bayview*, 474 U.S. at 134.

### a.   The *Rapanos* Guidance and 1980s Regulations

After *Rapanos*, the Agencies issued guidance in 2008 which purported to implement the Supreme Court's significant nexus test,[6] limiting the scope of the pre-existing regulations that defined "waters of the United States."[7] The *Rapanos* Guidance gave field staff the option to ignore it "depending on the circumstances," *id.* at 4 n.17, relied on an inconsistent "case-by-case" approach, *id.* at 4, and took a restrictive reading of the significant nexus test, *compare Rapanos*, 547 U.S. at 780 (asking if wetlands "and similarly situated lands in the *region*" collectively have a significant nexus with navigable waters (emphasis added)), *with Rapanos* Guidance at 10 (only examining collective significance of wetlands "adjacent to the *same tributary*" (emphasis added)). While the *Rapanos* Guidance offered *some* case-by-case protection for integral streams and wetlands, including intermittent and ephemeral tributaries, wetlands adjacent to such tributaries, and wetlands adjacent to but not abutting navigable waters, *id.* at 1, 8, 12, it did not clearly or consistently protect the nation's waters.

### b.   The Clean Water Rule

In response, the Agencies promulgated the Clean Water Rule in 2015 to clarify the scope of the Clean Water Act's coverage, ensure "predictability," "consistency," and "protection for

---

[6] *See* Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (EPA-HQ-OW-2007-0282-0001) (Dec. 2, 2008), https://perma.cc/56W8-KNXJ (permanent link) ("*Rapanos* Guidance").

[7] *See* 51 Fed. Reg. 41,206, 41,217, 41,250–51 (Nov. 13, 1986); 33 C.F.R. 328.3(a) (1987) (Corps' rules); 40 C.F.R. 232.2 (1988) (virtually identical EPA rules) (collectively "1980s Regulations").

the nation's public health and aquatic resources," *see* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054, 37,054 (June 29, 2015) ("Clean Water Rule"), and heed Justice Kennedy's call to "identify categories" of protected waters based on ecological science, *see Rapanos*, 547 U.S. at 780–81. Over the four-year rulemaking, the Agencies compiled an extensive empirical record, relying—to a large degree—on a "Science Report[8] [] based on a review of more than 1,200 peer-reviewed publications" to determine which waters possess a "significant nexus" with navigable waters. Clean Water Rule, 80 Fed. Reg. at 37,057, 37,060. The established science of hydrologic connectivity described in the Science Report demonstrates that intermittent and ephemeral tributaries, floodplain wetlands, and many non-floodplain wetlands generally exert a significant impact on the chemical, physical, and biological integrity of navigable waters, whether individually or cumulatively across a watershed. *See infra* notes 15–16. Thus, the Agencies asserted jurisdiction over those waters categorically or, in the case of non-floodplain wetlands, on a case-by-case application of the Supreme Court's significant nexus test. Clean Water Rule, 80 Fed. Reg. at 37,104–06.

In challenges to the Clean Water Rule, three district courts, including one in the Tenth Circuit, denied motions for preliminary injunction.[9] Four district courts outside the Tenth Circuit granted preliminary injunctions against the Rule, *see* Replacement Rule, 85 Fed. Reg. at 22,258–59 (collecting cases), including the District of North Dakota, which entered an injunction that

---

[8] U.S. EPA Office of Research and Dev., Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence, Docket ID No. EPA-HQ-OW- 2018-0149-11691 (Jan. 2015) ("Science Report").

[9] *See Wash. Cattlemen's Ass'n v. E.P.A.*, No. C19-0569-JCC, 2019 WL 7290590, at *2 (W.D. Wash. Dec. 30, 2019); *Oklahoma ex. rel. Hunter v. E.P.A.*, Nos. 15-cv-0381 & 15-cv-0386, 2019 WL 2288446, at *5 (N.D. Okla. May 29, 2019); *Ohio v. E.P.A.*, No. 2:15-cv-2467, 2019 WL 1368850, at *1 (S.D. Ohio Mar. 26, 2019).

initially covered New Mexico, *North Dakota v. E.P.A.*, No. 3:15–cv–59, Doc. 79 (Sept. 4, 2015).

Two of those courts held on summary judgment that aspects of the Rule were unlawful,

maintained their preliminary injunctions, and remanded but did not vacate the Rule. *See Georgia*

*v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019); *Texas v. E.P.A.*, 389 F. Supp. 3d 497 (S.D.

Tex. 2019). The District of North Dakota's preliminary injunction likely dissolved in New

Mexico after the state's agencies withdrew from the case, but that question is still pending.[10]

### c.   The Agencies' Unlawful Efforts to Suspend and Repeal the Clean Water Rule

In July 2017, the Agencies proposed to repeal the Clean Water Rule and reinstate the

1980s Regulations as informed by "applicable agency guidance documents" as the first step in a

splintered rulemaking intended to repeal and then replace the Clean Water Rule. Proposed Rule,

Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 82 Fed. Reg.

34899 (July 27, 2017). In the repeal rulemaking, the Agencies refused to consider the effects on

the nation's waters of repealing the Clean Water Rule, the scientific record supporting that Rule,

or the relative merits of the Clean Water Rule and the pre-Clean Water Rule regime, deferring

those "substantive" considerations to the replacement rulemaking. *Id.* at 34,903.

Rather than await the final rule repealing the Clean Water Rule, the Agencies hastily

conducted a rulemaking to *retroactively* delay the effective date of the Clean Water Rule by

---

[10] The court noted that its injunction was limited in scope "to only those entities before the court," lifted the injunction as to the withdrawn agencies—the New Mexico State Engineer and the New Mexico Environmental Department—and stated that it "remains in effect as to [new] Intervenor-Plaintiff Coalition of Arizona/New Mexico Counties for Stable Economic Growth." *North Dakota*, No. 3:15–cv–59, Doc. 280 at 2 (May 14, 2019). There is an unresolved dispute among the parties in that case, including the Agencies, as to whether it was appropriate for the court to automatically extend preliminary injunctive relief to intervenors in any portion of New Mexico based on the mere fact of intervention and given that they had not filed a motion for preliminary injunction, and whether that injunction (if any) applies only to the specific New Mexico counties served by the intervenors or to the entire state. *See id.* at Docs. 282, 286, 289.

nearly five years and reinstate the previous regime while the Agencies "conduct[ed] a substantive re-evaluation of the definition of 'waters of the United States.'" Definition of 'Waters of the United States'—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018) ("Suspension Rule"). Again, they deferred all substantive consideration of "waters of the United States" to the replacement rulemaking. *See* Proposed Rule, Definition of "Waters of the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule, 82 Fed. Reg. 55,542, 55,545 (Nov. 22, 2017).

In 2018, two District Courts rejected this attempt to bypass substantive issues, holding "that the agencies' refusal to consider or receive public comments on the substance of the [Clean Water Rule] or the 1980s regulation did not provide a 'meaningful opportunity for comment,'" *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 963 (D.S.C. 2018), *appeal dismissed*, No. 18-1964 (4th Cir. Feb. 4, 2019); *accord Puget Soundkeeper Alliance v. Wheeler*, No. 15-cv-01342, 2018 WL 6169196, at *5–6 (W.D. Wash. Nov. 26, 2018) (similar holding).

Undeterred, the Agencies finalized the repeal of the Clean Water Rule and recodification of the previous regime last October. Final Rule, Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule"). The Agencies cited legal reasons for why the Clean Water Rule purportedly exceeded their authority, including that it violated the significant nexus test, *id.* at 56,626, but again failed to analyze *the* most salient issue—the effects of the Repeal Rule on the nation's water quality. The Agencies also did not engage with the Clean Water Rule's scientific record or any science at all. Numerous lawsuits have been filed challenging the legality of the Repeal Rule, including the present case

and one currently stayed in the District of South Carolina. *See S.C. Coastal Conservation League v. Wheeler*, No. 2:19-cv-03006-DCN, Doc. 54 (D.S.C. Feb. 18, 2020).

### d. The Agencies' Unlawful Replacement Rule

The Agencies published the final Replacement Rule redefining "waters of the United States" in April 2020. *See* 85 Fed. Reg. 22,250. Having already undone the Clean Water Rule, the Agencies in the Replacement Rule impose unprecedented[11] restrictions on Clean Water Act protections for streams, wetlands, and even navigable lakes that serve as recreational hubs and provide drinking water but happen to also furnish cooling water for power plants. *See, e.g.*, *id.*

For the first time in the Act's history, the Replacement Rule categorically excludes ephemeral streams. 85 Fed. Reg. at 22,339. The Rule also excludes some untold number of intermittent streams. *See* U.S. EPA & Dep't of the Army, Economic Analysis for the Navigable Waters Protection Rule: Definition of "Waters of the United States" (Jan. 22, 2020), at 10-11, 22-23, https://perma.cc/5LHN-UUG4 (permanent link) ("Economic Analysis"). And it severely restricts jurisdiction over "adjacent wetlands," protecting only those that (i) "abut" another jurisdictional water; (ii) are "inundated by flooding from" another jurisdictional water in a "typical year;" (iii) are separated from a jurisdictional water by a single "natural feature;" or (iv)

---

[11] The only comparably restrictive reading in the Act's history is the Corps' first, which restricted "waters of the United States" to traditional navigable waters for purposes of implementing the dredge and fill program under Section 404 of the Act. *See* Permits for Activities in Navigable Waters or Ocean Waters, 39 Fed. Reg. 12,119 (Apr. 3, 1974); *see also* Replacement Rule at 22,254–55 (discussing history of "waters of the United States" regulations). However, EPA maintained a much broader interpretation at that time governing other parts of the Act, 38 Fed. Reg. 13528, 13529 (May 22, 1973), and a district court promptly vacated the Corps' rule as unlawfully restrictive. *See Nat. Res. Def. Council, Inc. v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975) (ordering Corps' to "[p]ublish . . . final regulations clearly recognizing the full regulatory mandate of the Water Act.").

are separated from another jurisdictional water by a single "artificial feature" that allows a direct hydrologic surface connection between the two in a "typical year." 85 Fed. Reg. at 22,338.

The result is that millions of stream miles and over half of the country's wetland acres of will lose protection under the Clean Water Act. *E.g.*, Sulliván Decl. ¶¶ 3, 24, 34. The harms to water quality will be particularly devastating in New Mexico, where ephemeral and intermittent streams comprise around 90 percent or more of the state's stream miles, NMED Comments at 1, 6, and provide drinking water for hundreds of thousands of the state's residents, *supra* note 3. The New Mexico Environment Department has estimated that the Replacement Rule will strip protections from 90 percent or more of the state's previously jurisdictional waters, has confirmed that "New Mexico does not have the capacity to fill the considerable gaps created by the [] rule," and has predicted that the Rule will "drastically and adversely impact the quality" of the state's scarce waters. NMED Comments at 6, 12, 14; *accord* Rebecca Roose Decl., *California v. Wheeler*, No. 3:20-cv-03005, Doc. 30-16, at ¶¶ 6–27 (N.D. Cal. May 5, 2018) ("Roose Decl.").

To achieve these results, the Agencies jettison the Supreme Court's significant nexus test, *e.g.*, 85 Fed. Reg. at 22,325, and adopt what is, at base, Justice Scalia's repudiated opinion in *Rapanos*. *Contra Colorado v. EPA*, No. 20-cv-1461, 2020 WL 3402325, at *12 (D. Colo. June 19, 2020) ("*Rapanos* forecloses this interpretation of the CWA."). They unlawfully interpret state authority under Section 101(b) of the Clean Water Act to override the Act's primary objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a); 85 Fed. Reg. at 22,261, 22464. And they claim that the Act's scope is a pure "legal question" that cannot be "dictate[d]" by "[s]cience." *Id.* Remarkably, EPA's

independent Science Advisory Board (SAB) concluded that the Rule "lacks a scientific justification" and "potentially introduce[s] new risks to human and environmental health."[12]

The Agencies admit that the Replacement Rule strips protections from substantial numbers of streams, wetlands, lakes, ponds, and other waters across the country, *e.g.*, Economic Analysis at 10–17, and that this will cause a plethora of harms, including increased water pollution, flooding, and oil spills, loss of aquatic habitat, reduced ecosystem services, and degraded drinking water, *e.g., id.* at 105. Yet the Agencies *again* refused to estimate the extent of reduced jurisdiction or "the potential [water quality] effect[s] of the final rule," repeatedly citing "limitations of the available data" to justify these failings. *E.g., id.* at 48; *id.* at xi, xviii, 8–17. Throwing up their hands, the Agencies effectively assign a value of "zero" to the vast majority of the Rule's ecological harms in a deceptive cost-benefit analysis, *e.g., id.* at xviii–xxi; Replacement Rule, 85 Fed. Reg. at 22,334.

In sum, the Replacement Rule is an unprecedented restriction of the Act's jurisdiction. Indeed, one court in the Tenth Circuit has preliminarily enjoined the entire Replacement Rule in Colorado, holding the state Plaintiff was likely to succeed on the merits of its claim that the Rule unlawfully adopts the *Rapanos* plurality opinion. *See Colorado*, 2020 WL 3402325, at *12–13.[13]

## PROCEDURAL BACKGROUND

Plaintiff here claims that the Agencies have not removed Clean Water Act protections from *enough* tributaries, wetlands, and other waters. On October 22, 2019, Plaintiff filed suit

---

[12] EPA SAB, Final Commentary on the Proposed Rule Defining the Scope of Waters Federally Regulated under the Clean Water Act (Feb. 27, 2020), at 4, https://perma.cc/76UW-LW9R (permanent link).

[13] In an opinion roundly criticized by *Colorado*, a district court outside the Tenth Circuit denied a motion by a coalition of states to preliminarily enjoin the Replacement Rule nationwide. *See California v. Wheeler*, No. 3:20-cv-03005, 2020 WL 3403072 (N.D. Cal. June 19, 2020).

challenging the Repeal Rule, 1980s Regulations, *Rapanos* Guidance, and—on constitutional grounds—the Act itself. *See* Doc. 1. Plaintiff filed a supplemental complaint on April 27, 2020, adding statutory and constitutional claims against the Replacement Rule. *See* Doc. 26.

On May 26, 2020, Plaintiff filed a motion for preliminary injunction seeking to enjoin the enforcement of the Replacement Rule to the extent it asserts federal jurisdiction over *any* intermittent tributaries and wetlands that do not directly abut navigable waters. Doc. 30 at 15–16. The Court set the response deadline for June 23, 2020, Doc. 29, the date of this response.

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary remedy, and … it should not be issued unless the movant's right to relief is clear and unequivocal." *Logan v. Pub. Employees Ret. Ass'n*, 163 F. Supp. 3d 1007, 1024 (D.N.M. 2016) (citations omitted). "To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

The typical purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, the Tenth Circuit "specifically disfavor[s]" preliminary injunctions that alter, rather than preserve, the status quo. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd*, 546 U.S. 418 (2006). Such motions "must be more closely scrutinized to assure that the exigencies of the case support the

granting of a remedy that is extraordinary even in the normal course," and the movant "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms," *id.* at 975–76; *see also id.* at 978 (Murphy, J, concurring) ("[A]n injury resulting from a preliminary injunction that disturbs the status quo . . . is a judicially inflicted injury. . . .").

Halting the enforcement of existing regulations or policies, and asking the Court to enforce a regulatory regime that has never been in place, clearly constitutes a change in the status quo. *Cole v. Goossen*, 402 F. Supp.3d 992, 1012 (D. Kan. 2019). In this case, Plaintiff asks for exactly that. As explained above, the Agencies—with Supreme Court sanction—have regulated certain intermittent streams and non-abutting wetlands for nearly five decades, an unbroken practice reaffirmed in the *Rapanos* Guidance at 1, 8, and 12, and the 1980s Regulations revived by the Repeal Rule, *see* 84 Fed. Reg. at 56,667.[14] As a result, the heightened standard for historically disfavored preliminary injunctions applies here.

## ARGUMENT

### I.    Plaintiff Will Not Succeed on the Merits

#### a.    Plaintiff Supported Federal Regulation of Intermittent Tributaries and Non-Abutting Wetlands in its Public Comments During the Replacement Rulemaking

In comments Plaintiff joined on the Proposed Replacement Rule, Plaintiff acknowledged that federal authority under the Act lawfully extends to intermittent tributaries and non-abutting

---

[14] In determining the status quo, courts look to "the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir.2001)*.* Therefore, the status quo, for these purposes of determining the standard of review, should be the decades-long practice up to and including the Replacement Rule of regulating certain intermittent streams and non-abutting wetlands.

14

wetlands; indeed, Plaintiff voiced *support* for federal regulation of many such waters. *E.g.*,
Comments of the Nat'l Cattlemen's Beef Ass'n on the E.P.A. and U.S. Army Corps of
Engineers' Proposed Rule, Revised Definition "Waters of the United States," Dkt. ID No. EPA-
HQ-OW-2018-0149-4673 (Apr. 15, 2019) ("NCBA comments"), at 8–9 (supporting regulation
of "seasonal[ly]" flowing tributaries), 13–14 (same as to non-abutting wetlands with a "direct
hydrological surface connection to a jurisdictional water"); *see also* Comments of Tom Sidwell,
on behalf of the N.M. Cattle Growers' Ass'n, on EPA and U.S. Army Corps of Eng'rs Proposed
Rule for the Revised Definition of "Waters of the United States," Dkt. ID No. EPA-HQ-OW-
2018-0149-4940 (Apr. 15, 2019) ("NMCGA comments"), at 3 (supporting regulation of
intermittent tributaries that flow "180 days" of the year as an alternative to excluding them).

 Plaintiff now inconsistently claims that the Agencies lack legal authority to regulate *any*
intermittent streams or non-abutting wetlands. Plaintiff may not take positions in this litigation
contrary to what it advocated in its comments. *See Del. Dep't of Nat. Res. & Envtl. Control v.
E.P.A.*, 895 F.3d 90, 96 (D.C. Cir. 2018) (explaining that, when a plaintiff "take[s] a position in
this court opposite from that which it took . . . before the agency," the "about-face render[s] its
claims forfeited" (citations and quotations omitted)).

### b. The Tenth Circuit's Significant Nexus Test Forecloses Plaintiff's Arguments

 Even if Plaintiff could raise its contrary position, it is foreclosed by binding Tenth Circuit
precedent. In *United States v. Hubenka*—decided shortly before *Rapanos*—the Tenth Circuit
held that *Riverside Bayview* and *SWANCC* established a "significant nexus" test for delineating
Clean Water Act jurisdiction. 438 F.3d 1026, 1033–34 (10th Cir. 2006). "[T]he potential for
pollutants to migrate from a tributary to navigable waters downstream constitutes a 'significant

nexus' between those waters," making all waters with such downstream connection "waters of the United States." *Id.* at 1034. In keeping with its "long acknowledg[ment of] the Corps' authority to regulate . . . tributaries," *id.* at 1033, the Circuit upheld a Corps rule regulating all tributaries of (*i*) traditional navigable waters, (*ii*) interstate waters and wetlands, (*iii*) all other waters "the use, degradation or destruction of which could affect interstate or foreign commerce," and (*iv*) impoundments of jurisdictional waters. *Id.* at 1031, 1034 (cites omitted).

Under *Hubenka*, the Replacement Rule unlawfully *abdicates* federal authority over many "waters of the United States." *See e.g.*, 85 Fed. Reg. at 22,338 (excluding ephemeral tributaries and non-floodplain wetlands that transport pollutants to navigable waters);[15] *see also Quivira Mining Co. v. EPA*, 765 F.2d 126, 130 (10th Cir. 1985) (holding the Act extends to creeks and arroyos that were only connected to navigable streams during "intense rainfall"). Ignoring Tenth Circuit precedent, Plaintiff asserts that the Rule does not restrict federal jurisdiction enough and

_____

[15] The undisputed findings of the Science Report are that waters excluded by the Replacement Rule—namely, ephemeral tributaries and wetlands outside the annual floodplain of navigable waters—often transport pollutants to navigable waters and exert significant impacts on the chemical, physical, and biological integrity of such waters through a myriad of surface and groundwater connections. *See, e.g.*, Science Report at ES-2–ES-4, 2-22–2-30, 3-1–3-45, 4-20–4-39; Clean Water Rule, 80 Fed. Reg. at 37,064 ("There is strong scientific evidence to support . . . includ[ing] *all* tributaries within the jurisdiction of the Clean Water Act" (emphasis added)), 37,069 ("The scientific literature, including the Science Report, consistently supports the conclusion that covered adjacent waters," including wetlands outside the annual floodplain of navigable waters, "provide similar functions and work together to maintain the chemical, physical, and biological integrity of downstream traditional navigable waters . . . ."); *accord* Dr. Sulliván Decl. ¶¶ 3–8, 15–51 (explaining that the Replacement Rule disregards the science of hydrologic connectivity, including the Science Report, and excludes nearly 5 million ephemeral stream miles and over 16 million acres of non-floodplain wetlands that have significant impacts on navigable water quality). These harms will be particularly pronounced in New Mexico, where nearly *all* rivers and streams are ephemeral or intermittent. *See, e.g.*, Science Report at 5-7–5-8 (describing "the substantial connection and important consequences of runoff, nutrients, and particulate matter originating from ephemeral tributaries [in the Southwest] on the integrity and sustainability of downstream perennial streams."); *see also* Sulliván Decl. ¶¶ 24–29, 38–39.

asks the Court to enjoin the Agencies from regulating *any* intermittent tributaries and non-abutting floodplain wetlands. But such tributaries and wetlands—as defined by the Replacement Rule—necessarily have the "potential for pollutants to migrate . . . to navigable waters downstream," *Hubenka*, 438 F.3d at 1034; *see* Replacement Rule, 85 Fed. Reg. at 22,339 (requiring tributaries to "contribute[] surface water flow to a [navigable water]" to be jurisdictional); *id.* at 22,338 (requiring non-abutting wetlands to be "inundated by flooding from," have a "direct hydrologic surface connection" to, or else be separated only by a single "natural feature" from, another covered water to be jurisdictional).[16] Because Plaintiff's position is contrary to Tenth Circuit precedent, it has not shown a likelihood of success on the merits.

### c. *Rapanos* Reaffirmed the Significant Nexus Test

In *Rapanos*, a majority of the Supreme Court voted to affirm federal jurisdiction over all waters with a significant nexus to navigable waters. 547 U.S. at 759 (Kennedy, J., concurring); *id.* at 810 (Stevens, J., joined by three other Justices, dissenting). Six circuit courts have construed *Rapanos* to hold that (1) waters and wetlands satisfying the significant nexus test are "waters of the United States," and (2) waters need not satisfy Justice Scalia's test to qualify.[17] The only question among the circuits is over *why* the significant nexus test controls.

---

[16] Moreover, the undisputed findings of the Science Report show that intermittent tributaries covered by the Rule significantly affect the chemical, physical, and biological integrity of navigable waters by transporting pollutants and a myriad of other surface and groundwater connections. *E.g.*, Clean Water Rule, 80 Fed. Reg. at 37,068–37,069. As to floodplain but non-abutting wetlands covered by the Replacement Rule, their impacts on the chemical, physical, and biological integrity of navigable waters are "particularly evident" and include transporting materials to navigable waters and numerous other ecological functions. *See, e.g., id.* at 37,069–70 ("Location within the floodplain and proximity ensure that the aquatic functions performed by covered adjacent waters are effectively and consistently provided to downstream waters.").

[17]*United States v. Donovan*, 661 F.3d 174, 183–84 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 798–800 (8th Cir. 2009); *United States v. Robison*, 505 F.3d 1208, 1221–23 (11th

### i. The "Narrowest Ground" Circuits

In *Marks v. United States*, 430 U.S. 188, 193 (1977), the Supreme Court held that, "[w]hen a majority of the Supreme Court agrees only on the outcome of a case and not on the ground for that outcome, lower-court judges are to follow the narrowest ground to which a majority of the Justices would have assented if forced to choose." *Gerke*, 464 F.3d at 724 (citing *id.*). As noted, Justice Kennedy in *Rapanos* held that federal authority under the Act extends to all waters and wetlands that, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" 547 U.S. at 780. Five Justices—Kennedy plus the four dissenters—rejected the four-Justice plurality's view that federal authority under the Act is limited to "relatively permanent, standing or continuously flowing bodies of water" and wetlands with "a continuous surface connection" to such waters, *id.* at 739, 742 (Scalia, J., plurality op.). *Id.* at 769–76 (Kennedy, J., concurring); *id.* at 788 (Stevens, J., dissenting).

Justice Kennedy concurred with the plurality opinion solely on the outcome—remand to the Court of Appeals to apply a different legal standard. *Rapanos*, 547 U.S. at 757 (Scalia, J.); *id.* at 759, 787 (Kennedy, J.). Far from Plaintiff's fictional telling, *see* Doc. 30 at 30 ("The judgment in *Rapanos* was to invalidate the tributary and adjacent wetlands subsections of the 1986

---

Cir. 2007); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724–25 (7th Cir. 2006); *United States v. Johnson*, 467 F.3d 56, 64–66 (1st Cir. 2006). The Fourth Circuit applied Justice Kennedy's test because the parties agreed it was controlling. *Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 288–89 (4th Cir. 2011). The Fifth Circuit declined to address the question because the evidence before it was sufficient to satisfy Justice Scalia's, Justice Kennedy's, and Justice Steven's tests. *United States v. Lucas*, 516 F.3d 316, 325–27 (5th Cir. 2008). The Sixth Circuit similarly reserved the question because the evidence satisfied both Justice Kennedy's and Justice Scalia's tests. *United States v. Cundiff*, 555 F.3d 200, 208, 210–13 (6th Cir. 2009).

Regulations"), eight Justices held or implied that those provisions could lawfully be applied to the specific waters at issue—"wetlands that do not contain and are not adjacent to waters that are navigable in fact," *Rapanos*, 547 U.S. at 759, 783 (Kennedy, J.); *id.* at 757 (Scalia, J.); *id.* at 810 (Stevens, J.). *No Justice*—not even Justice Scalia—voted to "invalidate" any regulatory provision.

Three circuits—the Seventh, Ninth, and Eleventh—hold that Justice Kennedy's standard is the narrowest grounds of majority assent—and, therefore, binding under *Marks*—because it infringes *less* on federal authority under the Act than the plurality opinion. *Gerke*, 464 F.3d at 724–25; *Robinson*, 505 F.3d at 1221–22; *City of Healdsburg*, 496 F.3d at 999–1000[18] (together, "narrowest ground circuits"). The Supreme Court took the same approach in *Marks*, finding that the narrowest ground in a fractured opinion was the one least restrictive of government authority. *See* 430 U.S. at 193–94 (holding that concurrence interpreting First Amendment to prohibit government regulation of obscenity was broader than plurality opinion authorizing regulation of obscenity). So, too, did the case on which *Marks* relied, *Gregg v. Georgia*, 428 U.S. 153, 169 & n.15, 188 (1976) (holding that concurrence finding death penalty unconstitutional per se was broader than plurality opinion finding it unconstitutional only under certain conditions).

Plaintiff reads *Marks* to hold that "the narrower *reading of the applicable . . . provision* [is] the controlling opinion," Doc. 20 at 25 (emphasis added), rather than the "narrowest *grounds*" of majority assent. *Marks*, 430 U.S. at 993 (emphasis added). But Plaintiff's assumption that the "narrower" reading is the one that *most* intrudes on federal authority is

---

[18] The Ninth Circuit has subsequently stated that *City of Healdsburg* did not necessarily preclude the agencies from using Justice Scalia's test to establish jurisdiction as an alternative to Justice Kennedy's test. *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 780–81 (9th Cir. 2011).

contrary to *Marks*, and Plaintiff does not cite a single case that has taken this approach. Moreover, on Plaintiff's view, if Justice Scalia had prohibited federal regulation of all waters save for the Great Lakes, it would still be the narrowest opinion even though an unprecedented intrusion on federal authority. Justice Scalia's actual opinion is also "unprecedented," *Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring); *accord id.* at 800 (Stevens, J., dissenting), whereas the significant nexus test—as recognized by the Tenth Circuit—merely reaffirms the rule of *SWANCC*. Thus, Plaintiff's view of what is "narrow" also violates an alternative reading of the term as "the least doctrinally far reaching common ground among the justices in the majority." *Cundiff*, 555 F.3d at 209 (citations and quotations omitted).

Applying the better-established reading of "narrowest grounds," the Seventh, Ninth, and Eleventh Circuits concede that, when there is a "slight surface hydrologic connection" between a non-navigable and a navigable water, Justice Kennedy might reject federal authority over the non-navigable water and Justice Scalia affirm it—making Justice Scalia's opinion narrower in such cases. *Gerke*, 464 F.3d at 724–25; *Robinson*, 505 F.3d at 1221–22. "But that will be a rare case, so as a practical matter the Kennedy concurrence is" narrowest. *Gerke*, 464 F.3d at 724–25.

### ii.  The "Majority Vote" Circuits

Three other circuits—the First, Third, and Eighth—have concluded that there are no "narrowest grounds" to be found among the plurality and concurring opinions. These circuits reason that, "because Justice Kennedy's test would find federal jurisdiction in some cases that did not satisfy the plurality's test, and vice versa[,] . . . . [i]t is therefore difficult, if not impossible, to identify the 'narrowest' approach." *Donovan*, 661 F.3d at 181–82; *accord Johnson*, 467 F.3d at 64; *Bailey*, 571 F.3d at 798–99. The Tenth Circuit would likely concur. *See*

*Large v. Freemont Cty.*, 670 F.3d 1133, 1141 (10th Cir. 2012) ("[T]he *Marks* rule produces a determinative holding only when one opinion is a logical subset of other, broader opinions." (citations and quotations omitted)); *see also Colorado*, 2020 WL 3402325, at *10 (citing Third Circuit's analysis of *Rapanos* in *Donovan* with approval).. Plaintiff's assertion that "the plurality's reading of the Act is necessarily a logical subset of . . . Justice Kennedy's," Doc. 30 at 28, is baseless. In fact, there "is quite little common ground between Justice Kennedy's and [Justice Scalia's] conceptions of jurisdiction under the Act, and both flatly reject the other's view." *Cundiff*, 555 F.3d at 210; *see also id.* n.2 ("The Pacific Legal Foundation argues that the plurality's test is a logical subset of Justice Kennedy's test. But this is unpersuasive."); *Colorado*, 2020 WL 3402325, at *12 ("[F]ive justices rejected the Scalia plurality[]").[19]

Consistent with established Supreme Court precedent,[20] the First, Third, and Eighth Circuits consider the views of the *Rapanos* dissenters to ascertain the rule of law garnering majority support. *Donovan*, 661 F.3d at 182–184; *Johnson*, 467 F.3d at 63–66; *Bailey*, 571 F.3d

---

[19] Recycling arguments unanimously rejected by the circuits, Plaintiff glosses over fundamental differences between Justice Scalia's and Justice Kennedy's opinions in an effort to cram the former "concentric[ly]" within the latter. *See* Doc. 30 at 26–29. But the two opinions disagree on virtually everything save that the Act covers "some waters that are not navigable in the traditional sense." *Rapanos*, 547 U.S. at 767 (Kennedy, J., concurring), 731 (Scalia, J., plurality op.); *accord Cundiff* 555 F.3d at 210. The commonalities Plaintiff fabricates to support its argument, *see* Doc. 30 at 26–29, merit no response but the Justices' own, *see id.* at 547 U.S. at 756 (Scalia, J., plurality op.) ("[Justice Kennedy's] test simply rewrites the statute."); *id.* at 778 (Kennedy, J., concurring) ("[T]he plurality reads nonexistent requirements into the Act.").

[20] *E.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 (1983) ("On remand, the Court of Appeals correctly recognized that the four dissenting Justices and Justice BLACKMUN formed a majority to require application of the *Colorado River* test."); *Alexander v Sandoval*, 532 U.S. 275, 282 (2001) (considering judgment of the Court, concurring and dissenting opinions to ascertain rule of law in fractured prior decision); *Alexander v. Choate*, 469 U.S. 287, 293 & nn. 8–9 (1985) (same); *accord Colorado*, 2020 WL 3402325, at *12 ("[The] agreement of five justices, even when not joining each other's opinions, 'carr[ies] the force of law' (quoting *Vasquez v. Hillery*, 474 U.S. 254, 262 n.4 (1986)); *United States v. Duvall*, 740 F.3d 604, 616 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (similar).

at 799 (together, "majority vote circuits"). Justice Stevens, writing for himself and three others in

dissent, found both Justice Scalia's and Justice Kennedy's opinions unduly restrictive of federal

authority. *Rapanos*, 547 U.S. at 788. The dissent would affirm jurisdiction "in all . . . cases in

which either the plurality's or Justice Kennedy's test is satisfied," and instructed lower courts to

affirm jurisdiction "if either of those tests is met." *Id.* at 810. "In any given case, [Justice

Stevens'] disjunctive standard will yield a result in which a majority of the *Rapanos* justices

would agree." *Donovan*, 661 F.3d at 184. Thus, the rule from *Rapanos* is that federal jurisdiction

extends to all waters satisfying *either* Justice Kennedy's *or* Justice Scalia's test. *Johnson*, 467

F.3d at 66; *Donovan*, 661 F.3d at 184; *Bailey*, 571 F.3d at 799.

  The Tenth Circuit's "logical subset" approach to *Marks* suggests it would align with the

First, Third, and Eighth Circuits, as does its approval of established authority considering the

views of dissenters to divine the rule of law in a fractured case, *see United States v. Carrizales-*

*Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (suggesting concurring view in fractured case was

not the law because "'three of the four Justices in the plurality *and* the four dissenters decisively

rejected'" the holding (citations omitted, emphasis in original)). Thus, the Tenth Circuit would

likely hold that *Rapanos* extends federal Clean Water Act jurisdiction to all waters satisfying

either Justice Kennedy's significant nexus test or Justice Scalia's plurality test. This Court should

do the same.

  But if this Court finds that there is no rule of law in *Rapanos*, then "no particular standard

constitutes the law of the land, because no single approach can be said to have the support of a

majority of the [Supreme] Court." *Freemont Cty.*, 670 F.3d at 1141 (citations omitted). In that

case, the significant nexus test would still control under *Hubenka*, and Plaintiff's motion would

be meritless for the reasons noted *supra*, Argument Section I.b). Plaintiff contends that, if no rule

of law can be divined, "only the judgment in [*Rapanos*] can be applied." Doc. 30 at 30 (citing

*Freemont Cty.*, 670 F.3d at 1141). But *Freemont County* said no such thing, and Plaintiff's view

is incomprehensible. As explained, the judgment in *Rapanos* was to remand to the Court of

Appeals to apply a different legal standard. Without ascertaining the governing standard on

remand, the judgment provides no rule for this Court to apply. *See Rapanos*, 547 U.S. at 810

(Stevens, J., dissenting) ("[B]oth the plurality and Justice Kennedy agree that there must be a

remand for further proceedings, [but] define different tests to be applied on remand."). That is

precisely why the dissent voted to affirm if either test is met—to give lower courts standards to

apply that guarantee five Justices would affirm jurisdiction. *Id.*

    In short, the significant nexus test is the controlling rule in *Rapanos* and, if this Court

finds the majority vote circuits persuasive, jurisdiction may alternatively be established under

Justice Scalia's test. If the Court cannot divine a controlling rule from *Rapanos*, *Hubenka*

governs, and the significant nexus test still controls. If, however, the Court finds that the Scalia

test alone controls, it would be the only such court in the country, controverting a Tenth Circuit

district court ruling in *Colorado*, and, as explained below, Plaintiff's arguments would still fail.

### d.  The Supreme Court Has Not Recognized Justice Scalia's Plurality Opinion as the Holding of *Rapanos*

    Contrary to Plaintiff's suggestions, the Supreme Court has never recognized the plurality

opinion as the holding of *Rapanos.* To the contrary, in discussing federal jurisdiction under the

Act, the Court has instead noted the obvious: that "no one rationale commanded a majority of the

Court." *Sackett v. EPA*, 566 U.S. 120, 124 (2012). Almost all Supreme Court cases that reference

the *Rapanos* plurality are unrelated to the Clean Water Act[21] and cite *Rapanos* for its factual

background, narrow procedural issues, or for established cannons of statutory interpretation.[22] In

cases concerning the Act, the Court has only cited *Rapanos* for points unrelated to the Act's

scope, or else to note the Justices' divergence on that issue.[23] None of these cases addressed the

definition of "waters of the United States" or indicated that the Court had adopted the *Rapanos*

plurality's interpretation of the phrase.

Most recently, in *County of Maui v. Hawaii Wildlife Fund*, the Court considered whether

the Act requires a permit when pollutants originate from a point source but are conveyed to

navigable waters by a nonpoint source. 140 S. Ct. 1462, 1468 (2020). Because the receiving

water in *County of Maui* was the Pacific Ocean—an undisputed navigable water—the Court had

no reason to address the scope of the term "waters of the United States," much less to adopt the

---

[21] *See Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268 (2015) (racial gerrymandering claim); *PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012) (whether state had acquired title to riverbeds under equal-footing doctrine); *Kucana v. Holder*, 558 U.S. 233, 252–53 (2010) (challenge to immigration statute); *Exxon Shipping v. Baker*, 554 U.S. 471, 508 n.21 (2008) (availability of punitive damages for negligence resulting in maritime oil spill); *Abramski v. United States*, 573 U.S. 169, 198 (2014) (Scalia, J., dissenting) (lawfulness of firearm sale); *Hamdan v. Rumsfeld*, 548 U.S. 557, 706 (2006) (Thomas, J., dissenting) (lawfulness of military commissions to try detainees at Guantanamo Bay).

[22] *See, e.g., Ala. Legislative Black Caucus*, 575 U.S. at 268 (citing *Rapanos*, 547 U.S. at 757) (remand is required when district court "failed to make a finding because of an erroneous view of the law").

[23] *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 625 (2018) (citing *Rapanos*, 547 U.S. at 723) (describing the permitting schemes under the Clean Water Act); *id.* (citing *Rapanos*, 547 U.S. at 729, 757) (summarizing Court's past attempts to define the scope of "waters of the United States" and noting the lack of a precise definition); *id.* at 633 (citing *Rapanos*, 547 U.S. at 729) (noting that *Rapanos* originated in the district court); *U.S. Army Corps of Engr's v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1811–12, 1815 (2016) (citing *Rapanos*, 547 U.S. at 721-22) (describing the facts of *Rapanos* and the costs and time involved in the permitting process); *Sackett*, 566 U.S. at 123–24 (citing *Rapanos*, 547 U.S. 715) (explicitly noting the lack of majority reasoning in *Rapanos*); *id*. at 133 (Alito, J., concurring) (citing *Rapanos*, 547 U.S. at 732–39) (noting that the "precise reach of the Act remains unclear").

24

*Rapanos* plurality's definition of the term. *Id.* at 1469. Rather, the Court cited the *Rapanos* plurality opinion as additional support for the Court's interpretation of the word "from" as it relates to point source discharges. *Id.* at 1475. The Court did not adopt the *Rapanos* plurality's interpretation of "waters of the United States" or indicate that the *Rapanos* plurality opinion is controlling. *See id.* at 1478 (Kavanaugh, J., concurring) (majority's interpretation regarding pollution "from" point sources "adheres to Justice Scalia's analysis in *Rapanos on that issue*") (emphasis added); *id.* at 1482 (Thomas, J., dissenting) (agreeing that the *Rapanos* plurality does not resolve this case, because the Court is "not bound by dictum in a plurality opinion").

### e. Plaintiff's Arguments Are Meritless No Matter Which Standard Applies

#### i. The Significant Nexus Test

As for Plaintiff's requested relief in its preliminary injunction motion, the result under Justice Kennedy's significant nexus test is the same as under *Hubenka*: the regulation of intermittent tributaries and non-abutting floodplain wetlands is plainly within the Agencies' authority because those waters, "alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters understood as 'navigable,'" *Rapanos*, 547 U.S. at 780 (Kennedy, J.). *See supra* Argument Section I.b) & note 16; *Rapanos*, 547 U.S. at 770, 780–81 (Kennedy, J.) ("[T]he Corps can reasonably interpret the Act to cover the paths of [] impermanent streams" and wetlands adjacent to "nonnavigable" jurisdictional tributaries); *see also Precon*, 633 F.3d at 291 ("[Justice Kennedy] explicitly approved of the Corps' regulat[ion of] . . . both those wetlands that directly abut waters of the United States and those separated from other waters 'by man-made dikes or barriers, natural river berms, beach dunes and the like.'" (citations omitted)); *United States v.*

*Moses*, 496 F.3d 984, 985, 989–91 (9th Cir. 2007) (holding portion of tributary that received flow two months of the year satisfied Justice Kennedy's test); *accord Riverside Bayview*, 474 U.S. at 134 (holding jurisdiction extends to wetlands that "border . . . *or are in reasonable proximity to* other waters of the United States" (emphasis added)).

The Replacement Rule does not unlawfully *expand* federal authority over intermittent tributaries and non-abutting floodplain wetlands—it unlawfully *abdicates* federal authority over millions of miles of ephemeral streams and non-floodplain wetlands. *See supra* n. 15.[24] Indeed, after a four-year rulemaking and review of 1,200 peer-reviewed publications on hydrologic connectivity, these same Agencies concluded in 2015 that intermittent and ephemeral tributaries, floodplain wetlands, and many neighboring wetlands outside the annual floodplain of navigable waters significantly affect navigable water quality and thus satisfy Justice Kennedy's test. *E.g.*, Clean Water Rule, 80 Fed. Reg. at 37,057–58, 37,064, 37,068–70. *Neither Plaintiff here nor the Agencies in the Replacement Rule dispute these well-established scientific conclusions.*

Instead, Plaintiff maintains that, if Justice Kennedy's test controls, the Court should enjoin the Agencies from regulating any intermittent tributaries and non-abutting floodplain wetlands "which [the Agencies] have not established, on a case-by-case basis, [have] a significant nexus to a downstream navigable-in-fact river or lake." Doc. 30 at 29. But Justice Kennedy held that the Agencies need not establish jurisdiction on a case-by-case basis and may regulate "categories" of waters that, "in the majority of cases," have a significant nexus with

---

[24] Justice Kennedy and the four dissenters would affirm jurisdiction over the ephemeral tributaries categorically shown to have a significant nexus with navigable waters, and the many wetlands outside the annual floodplain of navigable waters that have been shown to "perform critical functions related to the integrity of [navigable] waters—functions such as pollutant trapping, flood control, and runoff storage." *See Rapanos*, 547 U.S. at 779.

navigable waters, *Rapanos*, 547 U.S. at 780–81; as explained, intermittent tributaries and non-abutting floodplain wetlands categorically qualify, *e.g., supra* note 16; Replacement Rule, 85 Fed. Reg. 22,288, 22,314. Moreover, an injunction requiring a case-by-case analysis—even if it were appropriate—would have to extend that approach to *all* tributaries, including ephemeral tributaries, *see Rapanos*, 547 U.S. at 769–70 (Kennedy, J.) (noting tributaries that only flow during "flood or inundation" may be jurisdictional); *see also* Roose Decl. ¶ 13 ("Science has clearly demonstrated that ephemeral waters are ecologically and hydrologically significant in . . . New Mexico."), and to wetlands adjacent to *all* tributaries, *id.* at 772, 775, 782 (holding the Act covers "'wetlands adjacent to other bodies of water over which the [Agencies] ha[ve] jurisdiction,'" including "nonnavigable tributaries," and that wetlands' pollution storage functions mean that "the absence of an interchange of waters [may be what] makes protection of the wetlands critical to the [Act]." (citations omitted)).

### ii.  Justice Scalia's Test

Even if Justice Scalia's repudiated test applied, Plaintiff's legal position would fail. Justice Scalia never concluded that the regulation of intermittent tributaries or non-abutting wetlands exceeds the Agencies' authority.

As to tributaries, Justice Scalia would limit federal authority to "relatively permanent, standing or flowing bodies of water," including "streams," *Rapanos*, 547 U.S. at 732–33, and reserved the question of how "continuous and frequent" flow must be to achieve relative permanence, expressly *not* "exclud[ing] seasonal rivers . . . [and streams]" from jurisdiction, *id.* at 732 n.5. Thus, even Justice Scalia would deem intermittent tributaries—as defined by the Replacement Rule—jurisdictional. *See* 85 Fed. Reg. at 22,338–39 (defining covered tributaries

as "a river, stream, or similar naturally occurring surface channel that contributes surface water flow to a [navigable water] in a typical year" and flows, at the very least, "continuously during certain times of the year . . . e.g., seasonally"). *Plaintiff acknowledged this* in comments on the proposed Rule. *See* NCBA comments at 10–11 (stating Justice Scalia would only "require[] continuous flow for at least 'some months' out of the year" and "intentionally left open the question of whether jurisdiction could be exerted over seasonal rivers, leaving it to the agency to draw the distinction").

As to wetlands, Justice Scalia would require a "continuous surface connection" to a "relatively permanent body of water." *Rapanos*, 547 U.S. at 741. Justice Scalia never required that wetlands "*physically abut* relatively permanent" waters to be jurisdictional. *Contra* Doc. 30 at 12, 29 (Plaintiff's assertion). Justice Kennedy noted that according to the plurality, "the Act covers wetlands (however remote) possessing a surface-water connection with a continuously flowing stream . . . ." *Rapanos*, 547 U.S. at 776–77 (Kennedy, J.). That is, even Justice Scalia would affirm jurisdiction over certain non-abutting wetlands. Yet again, *Plaintiff acknowledged this* in comments on the proposed Replacement Rule. *See* NCBA comments at 13 (noting Justice Scalia would affirm Clean Water Act jurisdiction over non-abutting wetlands with a "direct hydrological surface connection to a jurisdictional water").

Plaintiff repeatedly conflates the terms "adjacent" and "abutting." *E.g.*, Doc. 30 at 10–11, 27 (citing *Riverside Bayview*, 474 U.S. at 124 n.1, 131 n.9, and *Rapanos*, 547 U.S. at 728, 759, both of which use the term "adjacent," not "abutting"). Every Justice in *Rapanos* agreed that the Act covers wetlands "adjacent" to navigable waters, and *none of the Justices* defined "adjacent" simply as "abutting." *See, e.g., id.* at 741–42 (Scalia, J.); *id.* at 766–67, 772–73 (Kennedy, J.); *id.*

at 788, 805 (Stevens, J.). Even Justice Scalia's "preferred Webster's Second defines [adjacent] as '[l]ying near, close, *or* contiguous; neighboring; bordering on' and acknowledges that 'objects are ADJACENT when they lie close to each other, but *not necessarily in actual contact*.'" *Id*. at 805 (Stevens, J., dissenting) (quoting Webster's New Int'l Dictionary 32 (2d ed.) (emphasis in original)); *accord Riverside Bayview*, 474 U.S. at 134 (upholding definition of "adjacent wetlands" as those "in reasonable proximity to other waters of the United States.").

Plaintiff's perennial tributary and physical abutment requirements are baseless and unprecedented. No matter what test controls—Justice Kennedy's (say all circuits), Justice Scalia's (say no circuits), or both (say some circuits)—Plaintiff has not shown a "'substantial likelihood of success on the merits.'" *Aposhian*, 958 F.3d at 978 (citations omitted).

## II.    Plaintiff Has Not Shown Harm, Much Less Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). To show irreparable harm, a plaintiff must show that it will suffer a real and immediate injury. "Speculative injury is not sufficient." *Id.*

### a.    Given Its Four-Decade-Long Delay in Seeking Relief, Plaintiff Cannot Credibly Claim that Any Harm Is Serious Enough to Justify a Preliminary Injunction

The Agencies have interpreted "waters of the United States" to encompass intermittent tributaries of navigable waters for at least 47 years, and have interpreted the phrase to include

wetlands adjacent to, but that do not directly abut, navigable waters since at least 1977. *Supra* Legal Background, Section II;[25] *accord Riverside Bayview*, 474 U.S. at 134.

Given its decades-long delay in seeking relief, Plaintiff cannot credibly claim that any harm is serious enough to justify a preliminary injunction. *See* Wright & Miller, § 2948.1 ("A long delay by plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."); *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("In considering the balance of equities among the parties, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request."); *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) (Although "there is no categorical rule that delay bars the issuance of an injunction," "it is true that 'delay in seeking preliminary relief cuts against finding irreparable injury.'"). Put simply, Plaintiff's half-century delay belies its newly professed need for urgent, extraordinary relief. *See Citibank, N.A., v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985) ("[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least reduced need for such drastic, speedy action."). If Plaintiff was willing to live with the status quo for nearly half a century, it can live with it for a few more months.

### b.  Plaintiff's Comments Undercut Its Claim of Immediate, Irreparable Harm

Plaintiff's comments further undercut its claim of irreparable harm. As described above, in comments Plaintiff joined and in individual comments on the Proposed Replacement Rule, Plaintiff acknowledged that the Act lawfully extends to intermittent tributaries and non-abutting

---

[25] *See also* 33 C.F.R. § 209.120(d)(2)(i) (1976) (interim regulations); 33 C.F.R. 323.2(a)(5) (1978); 33 C.F.R. § 328.3(a)(3) (1986); *Rapanos* Guidance at 1, 8, and 12.

wetlands; indeed, Plaintiff voiced *support* for federal regulation of many such waters. *See supra* Legal Background, Section I(a). Plaintiff cannot now credibly claim immediate, irreparable harm from the regulation of *any* such waters when it made no such claim before the Agencies.

### c.   Plaintiff Has Not Been Deprived of Any Constitutional Right

Plaintiff argues that, because it *alleges* claims under the Commerce Clause and Tenth Amendment, "no further showing of irreparable injury is necessary." Doc. 30 at 24 (citing 11A Wright & Miller, § 2948.1). First, the assertion of constitutional claims does not automatically entitle Plaintiff to a finding of irreparable injury—Plaintiff must at least show a likelihood of success on the merits of those claims. Here, Plaintiff barely mentions the merits of its constitutional claims, instead citing the mere existence of those claims in an attempt to establish irreparable injury.

What little reference Plaintiff does make to the merits of its constitutional claims is wrong. The Replacement Rule does not violate the Commerce Clause, which allows Congress to regulate: (1) the channels of interstate commerce; (2) persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). This authority extends to the regulation of navigable waters and activities that significantly affect navigable waters. *Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942) (holding that the Commerce power extends to all activities that, in the aggregate, have a substantial effect on interstate commerce); *PPL Montana, LLC*, 565 U.S. at 592–93 (2012) (waters are "navigable in fact" when they are or may be used "as highways for commerce," but "the commerce power extends beyond navigation"); *Rapanos*, 547 U.S. at 776–77 (Kennedy, J., concurring) (explaining that in *SWANCC*, the requirement of a "significant nexus" to navigable

31

waters avoided constitutional or federalism concerns, and that "remote wetlands and
nonnavigable waterways [have] . . . aggregate effects on national water quality").

The intermittent streams and non-abutting wetlands regulated by the Replacement Rule
significantly affect navigable waters. *See supra* n. 16. Plaintiff offers no evidence to the contrary.
Therefore, the Replacement Rule falls well within Congress's Commerce Clause authority.

Plaintiff's Tenth Amendment claim falls with its Commerce Clause claim. *United States
v. Mussari*, 95 F.3d 787, 791 (10th Cir. 1996) ("If . . . Congress acts under one of its enumerated
powers—here, its power under the Commerce Clause —there can be no violation of the Tenth
Amendment."). Because Congress has the authority to regulate the intermittent streams and non-
abutting wetlands regulated by the Replacement Rule, that right is not reserved to the states
under the Tenth Amendment.

In any event, the cases relied on by Plaintiff to support its position largely address the
deprivation of a fundamental individual constitutional right, such as freedom of speech, freedom
of religion, or due process—not a violation of the Commerce Clause or Tenth Amendment. For
example, *Fish v. Kobach*, the only Tenth Circuit opinion cited by Plaintiff, involved the
"constitutionally protected fundamental right" to vote. 840 F.3d at 732.

Plaintiff cites only two cases to support its argument that a violation of the Commerce
Clause, as opposed to an individual, fundamental right, implicates the type of "deprivation of a
constitutional right" that supports a finding of irreparable injury. The first, a 25-year old New
Jersey case, actually held: "[T]he violation of dormant Commerce Clause rights unaccompanied
by other irreparable harm does *not* weigh heavily on the moving party's side of the scale." *Atl.
Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cty.*, 893 F. Supp. 301,

309 (D.N.J. 1995) (emphasis added). The second, a 31-year old California case, found irreparable harm, but also based its conclusion on the movant's showing that it would suffer irreparable injury to its reputation and goodwill. *Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 753 (N.D. Cal. 1989). Plaintiff cites no case to support its argument that a violation of the Tenth Amendment necessitates a finding of irreparable injury, much less irreparable injury to a non-state movant.

### d. Plaintiff's Declarations Do Not Show Harm

Plaintiff also fails to show harm through its declarations. As described above, the Replacement Rule excludes all ephemeral streams and many intermittent streams from permitting requirements. It covers fewer waters than any regulatory scheme in the past 47 years, meaning that any waterways that were non-jurisdictional in the past will likely remain non-jurisdictional in the future, belying any claim of harm. For example, Mr. Sidwell says he will be harmed because he has done streambed improvement activities in arroyos on his ranch in the past and would like to continue doing them in the future. But if these activities were exempt or non-jurisdictional in the past, as Mr. Sidwell implies, it is likely that they will remain exempt or non-jurisdictional in the future.

Further, it appears that many of the activities that are described in Plaintiff's declarations are likely exempt from permitting requirements. Under the Clean Water Act, "the discharge of dredged or fill material" is exempt from permitting requirements if such discharge is "from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices" or "for the purpose of construction or maintenance of farm or stock

ponds or irrigation ditches, or the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(A),

(C). In short, both of Plaintiff's declarations fail to describe any harm to the declarant or to

Plaintiff's members, much less imminent, non-speculative, irreparable harm.

## III.    A Preliminary Injunction Is Not in the Public Interest

"'In exercising their sound discretion, courts of equity should pay particular regard for

the public consequences in employing the extraordinary remedy of injunction.'" *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted). In some cases, "a proper

consideration of [the public interest] factors alone requires denial of the requested injunctive

relief." *Id.* at 23. This is one of those cases.

It is hard to imagine a more compelling public interest than ensuring safe, clean drinking

water. People depend on clean drinking water for their health. Unsurprisingly, there is no

shortage of cases recognizing the "profound" and "unusually compelling public interest" in

protecting it. *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65,

112 (2d Cir. 2013); *U.S. v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). So too here,

the need to protect the drinking water supply of hundreds of thousands of New Mexicans, *see*

*supra* n. 3, plainly trumps any purported injury to Plaintiff, especially because any alleged

injuries are minor, speculative, and not imminent.

The protection of non-abutting, hydrologically connected wetlands is equally important

to the public interest. As the Supreme Court has recognized, "wetlands can perform critical

functions related to the integrity of other waters—functions such as pollutant trapping, flood

control, and runoff storage." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring). Clean water

serves other public interests too. According to the New Mexico Environment Department, 65%

34

of New Mexicans participate in outdoor recreation activities each year. Roose Decl. ¶ 25. The New Mexico Tourism Department reports that visitors to New Mexico spent $846 million on recreation in 2017, supporting 13,000 jobs. *Id.* In addition, the New Mexico Department of Game and Fish reports that 160,000 anglers fish in New Mexico, spending $268 million annually. *Id.* People do not like to fish, raft, boat, and camp on polluted waters.

Last, in targeting specific provisions of the Replacement Rule rather than seeking to preserve the status quo ante, Plaintiff would impose a hybrid, partially enjoined Rule, which would be "confusing" and "against the public interest." *Colorado,* 2020 WL at 2302325, at *13

## IV.    The Balance of Equities Weighs Decisively against Preliminary Injunctive Relief

As described above, there is no evidence of actual, imminent harm to Plaintiff. But there is substantial evidence that a preliminary injunction would harm the public's interest in clean, healthy waterways. Thus, the balance of equities weighs against preliminary injunctive relief.

**CONCLUSION**

For all of the foregoing reasons, the Court should deny Plaintiffs' motion, Doc. 30.

Respectfully submitted this 30th day of June, 2020.

Charles de Saillan
Douglas Meiklejohn
Eric Jantz
New Mexico Environmental Law Center
1405 Luisa Street, Suite 5
Santa Fe, New Mexico 87505
Telephone: (505) 989-9022
cdesaillan@nmelc.org
dmeiklejohn@nmelc.org
ejantz@nmelc.org
*Counsel for the Water Groups*

Enrique Romero
New Mexico Acequia Association
805 Early Street
Suite B203
Santa Fe, New Mexico  87505
Telephone: (505) 995-9644
enrique@lasacequias.org
*Counsel for the New Mexico Acequia
Association*

J. Blanding Holman IV*
Southern Environmental Law Center
bholman@selcsc.org
525 East Bay Street
Charleston, SC 29403
Telephone: (843) 720-5270
*Counsel for Amigos Bravos*

Megan Hinkle Huynh*
Southern Environmental Law Center
mhuynh@selcga.org
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Telephone: (404) 521-9900
*Counsel for Amigos Bravos*

**pro hac vice* applications forthcoming

## **CERTIFICATE OF SERVICE**

I certify that on June 30, 2020, I electronically filed the foregoing Water Groups'

Response in Opposition to Plaintiff's Motion for Preliminary Injunction with the Clerk of

Court using the CM/ECF system, which will send notification of this filing to the attorneys of

record.