UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| NEW MEXICO CATTLE GROWERS' ASSOCIATION, | ) ) ) | Case No. 1:19-cv-00988-RB-SCY |
| Plaintiff, | ) ) | |
| v. | ) ) | **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## INTRODUCTION

Plaintiff New Mexico Cattle Growers' Association's (Cattle Growers) Motion for Preliminary Injunction, Dkt # 30 (Motion), demonstrates that Plaintiff has standing and meets the four criteria for a preliminary injunction against the intermittent tributary and non-abutting wetland provisions of the Navigable Waters Protection Rule (Rule). Neither the Defendant Agencies nor Intervenors successfully refute standing or the propriety of an injunction against the offending provisions. The Court should grant the injunction.

**I.   Cattle Growers Has Standing and Its Claims Are Ripe**

The Agencies contend that Cattle Growers' claims against the two challenged provisions are not ripe because there is no catalog of projects with timetables presented with the Motion. This is incorrect. Cattle Growers' declarations establish that intermittent tributaries and non-abutting wetlands are common features on member farms and ranches throughout New Mexico. Frost-Maynard Decl. ¶¶ 5-6, Dkt # 30-1 at 2; Sidwell Decl. ¶ 13, Dkt # 30-2 at 3-4. The declarations also show that Cattle Growers' members frequently perform regulated activities in these features that

are regulated by the Rule. Frost-Maynard Decl. ¶ 6, Dkt # 30-1 at 2. As a result of this combination of regulated water features and regulated activities, Cattle Growers members are subject to the challenged provisions of the Rule *now*, not in some speculative future. They must choose *now* to either forego otherwise lawful and perfectly routine activities such as plowing and planting crops, erosion and flood control, and related farm and ranch operations, or spend two years and a quarter-million dollars seeking permits, or act without permits and face crippling fines and prison. Sidwell Decl. ¶¶ 11-16, Dkt # 30-2 at 3-4; Frost-Maynard Decl. ¶¶ 6-7, Dkt # 30-1 at 2-3.

Even as to future operations, two factors combine to make the injuries imposed by the Rule imminent so as to make the claims ripe: (1) the exigent nature of work like erosion and flood control and other activities that respond to rapidly changing weather conditions that may occur any time, along with the seasonal nature of plowing and planting, and (2) the two-year quarter-million dollar permitting effort that is necessary to "legalize" otherwise routine, annual, and ongoing farming operations that need to take place sooner than two years in the future. *See* Transcript of Proceedings, Exhibit B to François Decl., Dkt # 30-5 at 4-6 (transcript of District Court for the District of Oregon's order granting preliminary injunction against prior version of Agencies' "navigable waters" regulations and finding imminent and irreparable harm in the need to obtain permits for exigent and unforeseen events caused by weather).

Cattle Growers' claims are ripe because the illegal regulation of their members' property and illegal restriction on their otherwise lawful use of that property is occurring now, not in some speculative future.

## II. Cattle Growers Will Succeed on the Merits

Contrary to almost the entirety of the Agencies' arguments on this element, this is not a *Chevron*/*Brand X* case. The dispositive issue in this motion is what the precedential effect of the *Rapanos* decision is. Cattle Growers argue, Motion at 12-22, that the plurality is the precedential holding of *Rapanos* under the Tenth Circuit's controlling approach to *Marks*. If this is correct, then the unambiguous text of the Clean Water Act prevents regulation of intermittent tributaries or non-abutting wetlands. *Rapanos*, 547 U.S. 715, 739 (2006). None of the Agencies' discussion of *Chevron* or *Brand X* is applicable to the case. If the statute is unambiguous in excluding intermittent tributaries and non-abutting wetlands, as the *Rapanos* plurality holds, then *Chevron* and *Brand X* are not available to salvage the Agencies' decision to regulate them. *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982 (2005). Since the application of *Brand X* in particular turns on whether the prior judicial interpretation of the statute identified an unambiguous meaning, *id.*, this Court must resolve the question whether the plurality, which reads the statute as unambiguous on the salient point, is controlling, *see Rapanos*, 547 U.S. at 739 ("on its only plausible interpretation"). If the plurality does control on the issues of regulating intermittent tributaries and non-abutting wetlands, *Brand X* and *Chevron* have no further role in the case.

The Agencies do not strongly dispute Cattle Growers' argument that under *Marks*, the plurality is the holding of *Rapanos*. Instead, they claim that the Court should look past *Marks* and instead defer to the Agencies' creative reshuffling of *Rapanos*. Agencies' Opposition at 16. They point to the few Circuits which have concluded incorrectly that *Marks* cannot be applied. Agencies' Opposition at 17. As discussed in Cattle Growers' Motion at 23, three Circuits conclude

(1) that *Marks* cannot be applied (a logical but incorrect possibility), and (2) that since *Marks* cannot be applied, both the plurality and concurrence can be relied upon (an impossibility under Tenth Circuit law). These circuits are in error as to both conclusions. Motion at 23. Under Tenth Circuit law, if neither opinion is the holding, then there is no holding. Motion at 17. So, it is necessary for the Court to apply *Marks* if it can, in the manner that the Tenth Circuit applies it. The Motion capably demonstrates that under that analysis, the plurality is the holding. Motion at 12-22. The Agencies provide no alternative *Marks* analysis to dispute it; they don't even explain why the Circuits that have chosen the concurrence under *Marks* are correct to have done so.

The Intervenors' *Marks* analysis fares even worse. They misread how the logical subset analysis works under the D.C. Circuit's decision in *King v. Palmer* and applicable Tenth Circuit authorities adopting *King v. Palmer*. *See* Motion at 17. Under *King v. Palmer*, while a dissent may be helpful in assessing whether and which of the opinions supporting the judgment may be narrower than the other, the dissent may not be either of the two actual candidates for the holding. *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc) ("narrowest opinion . . . must embody a position implicitly approved by at least five Justices *who support the judgment*.") (emphasis added). So under *King v. Palmer* as adopted in the Tenth Circuit, the *Rapanos* dissent and concurrence may not be used to fashion a holding.[1]

But *Chevron* would not save the two specific provisions of the Rule challenged in this motion in any event. This motion challenges the Rule's universal regulation of all intermittent

---

[1] Intervenors also argue oddly that a Tenth Circuit case predating *Rapanos* is stronger precedent than the Supreme Court's subsequent decision in *Rapanos*. As demonstrated, the *Rapanos* plurality is the holding of the case under *Marks*; binding precedents of the Supreme Court prevail over contrary circuit decisions.

tributaries, and of three categories of non-abutting wetlands. Both of these types of features were at issue in *Rapanos*. Motion at 12-13. The plurality and concurrence agreed that the regulation of categorically all intermittent tributaries could not be sustained under the Act. Motion at 13; *id*. at 21. Yet the Agencies now argue that they can combine different elements of the plurality and concurrence to arrive at "common themes"[2] of both that somehow avoid the outcome that both opinions agreed on. Whatever one makes of the *Rapanos* opinions, the result of the case is that the categorical regulation of all intermittent tributaries violates the Act. A regulation which does the exact same thing cannot be a reasonable reading of the Act.

In the Agencies' effort to defend this outcome, they describe their authority to interpret the Act as a broad and standardless power to adopt varying contours along a wide continuum based on numerous policy factors. Agencies' Opposition at 18-19. The output of this process is two meaningless expressions that are said to provide definition to EPA's authority: "sufficient connection," Agencies' Opposition at 19, and "regular connection," *id*. at 23. This boils down to the Agencies claiming that the limiting principle in the Clean Water Act is whether a feature has either a "sufficient" or "regular" connection to another regulated water body. This might be the only possible alternative to Justice Kennedy's concurrence that is even more malleable than the "significant nexus" test. Nor do the Agencies ever explain how regulating those features with only a sufficient or regular connection would satisfy either the plurality, which rejected such an

---

[2] The Agencies' approach to *Rapanos* turns it from a decision of the Supreme Court of the United States with one and only one precedential holding into a faculty symposium, from which an agency may self-interestedly harvest whatever combination of "elements" or "themes" are useful to justify a desired outcome. This is not how Supreme Court decisions bind agencies.

approach outright, or Justice Kennedy, who insisted that connections have more substance to them than this. Motion at 18-21; *Rapanos*, 547 U.S. at 781-82 (Kennedy, J., concurring).

The adoption of vague standards like sufficient or regular connection, and their similarity to the significant nexus test, also introduces constitutional infirmities which independently reinforce the *Marks*-based argument that the *Rapanos* plurality is the correct way to read the limits of the Act.

The interpretation of "navigable waters" is subject to constitutional constraints. Under the canon of constitutional avoidance, this Court should look to which of the *Rapanos* opinions interprets the Act to avoid giving it a constitutionally suspect meaning. Any interpretation that would extensively regulate a wide range of non-navigable tributaries or non-abutting wetlands raises issues under the Commerce Clause and the Tenth Amendment.

The Supreme Court held in *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs* (*SWANCC*) that the Act lacks a "clear statement" of congressional intent to exercise the Commerce Power to its outer limits. 531 U.S. 159, 172-74 (2001). Reading the statute broadly to reach farming and related activities through regulation of intermittent tributaries, for example, would authorize federal regulation over a wide range of local decisions involving water resources and closely regulate land use and planning, all traditionally state and local government functions which are explicitly protected from invasion by Section 1251(b). Reading the Act to allow this would violate the clear statement rule and is impermissible. *SWANCC*, 531 U.S. at 174; *Rapanos*, 547 U.S. at 737-38.

Further, the legislative history of the Act only supports the exercise of the Commerce Power over its traditional object: the transport of goods in interstate commerce through navigation.

*SWANCC*, 531 U.S. at 168; *id.* at 168 n.3. Any reading of "navigable waters" that authorizes regulation substantially beyond waters used to transport interstate commerce would violate the clear statement rule and *SWANCC*.

Similarly, a broad reading of "navigable waters" would violate the Tenth Amendment's reservation of powers to the states, including the states' traditional authority over land use and water resource allocation which are expressly recognized and protected in the Act. 33 U.S.C. § 1251(b). *See* Gary E. Parish & J. Michael Morgan, *History, Practice and Emerging Problems of Wetlands Regulation: Reconsidering Section 404 of the Clean Water Act*, 17 Land & Water L. Rev. 43, 84 (1982) ("The existing [regulation] looks and has an effect similar to a program of federal land use control. There should be little doubt that Congress did *not* intend such a result.").

The Tributary and Non-abutting Wetland Provisions raise these constitutional concerns to their height. Cattle Growers' members' use of portions of their land where intermittent tributaries and non-abutting wetlands are located for growing crops, raising livestock, and the wide range of related activities that support those primary uses, has no impact at all on the use of downstream navigable-in-fact rivers or lakes to transport goods in commerce. The Army's permitting regime applied to farming and related land uses on private farms and ranches directly conflicts with local land use administration. Because Army dredge and fill permitting is so time consuming and expensive, and ultimately restricts subsequent land use, the need to obtain the permit amounts to a de facto federal veto over quintessentially local land use matters like farming. This federal veto of local land use permitting is exactly what *SWANCC* says the Clean Water Act cannot be interpreted to allow. Because the *Rapanos* plurality does not allow such regulation, while Justice Kennedy's concurrence does, the plurality must be preferred under the canon of constitutional avoidance.

The *Rapanos* plurality also avoids Due Process and Non-Delegation concerns implicated by Justice Kennedy's concurrence as well as by the Agencies' new "sufficient connection" and "regular connection" tests. The Due Process Clause of the U.S. Constitution requires that criminal statutes provide adequate notice of the conduct which they proscribe to those who must comply. *United States v. Lanier*, 520 U.S. 259, 265-67 (1997). The Clean Water Act imposes criminal penalties. 33 U.S.C. § 1319(c). The rule of lenity also requires that statutes with criminal penalties be interpreted in the light most favorable to criminal defendants. *United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."). Judges who have sought to apply Justice Kennedy's concurrence have noted the vagueness issues it introduces. *See*, *e.g.*, *Hawkes Co., Inc. v. U.S. Army Corps of Engineers*, 782 F.3d 994, 1003 (8th Cir. 2015) (Kelly, J., concurring) ("[M]ost laws do not require the hiring of expert consultants to determine if they even apply to you or your property."); *Orchard Hill Building Company v. U.S. Army Corps of Engineers*, 893 F.3d 1017, 1025 (7th Cir. 2018) ("Justice Kennedy did not define 'similarly situated'—a broad and ambiguous term . . ."). Recognition of the *Rapanos* plurality as the holding comports with the Rule of Lenity and the Due Process Clause.

Justice Kennedy's *Rapanos* concurrence interprets the Clean Water Act to regulate an extensive catalog of "tributaries" that are not navigable and which are not even "waters" for most of every year, as well as non-navigable isolated lakes and ponds, and non-abutting wetlands, so long as these features have a vaguely defined "significant nexus." The Agencies' new "sufficient" and "regular connection" criteria do as well. The Supreme Court has held that while the Clean Water Act regulates some waters that are not navigable-in-fact, it does not regulate all "waters"

and that "navigable" must have some limiting meaning. *SWANCC*, 531 U.S. 171-72 (the Act regulates some waters not "deemed navigable under the classical understanding of that term" but not all such waters) (quoting *United States v. Riverside Bayview Homes*, 474 U.S. 121, 133 (1985)). These same concerns apply equally to waters with vaguely stated "sufficient" or "regular" connections.

The Act does not define "navigable." If the term does not have its ordinary meaning but instead has some broader or different meaning like "significant nexus" or "sufficient/regular connection," then the statute unconstitutionally delegates to EPA and the Army the task of deciding, as a policy matter, what waters they will regulate. The Agencies themselves see their work in adopting the provisions challenged in this motion as largely one of identifying, balancing, and selecting among competing policy priorities. *See*, *e.g.*, 85 Fed. Reg. at 22,264, 22,270-71, 22,277, 22,290, 22,292, 22,300.

In making this delegation, the Act lacks any appropriately understood "intelligible principle" and provides no guidance or criteria to the Agencies to circumscribe their policy decision defining "navigable." The Act identifies no fact-finding that the Agencies must engage in to define "navigable." The Act provides no factors for the Agencies to consider, let alone what weight to give to any such factors, in determining the meaning of "navigable." Rather, if "navigable" in the statute means something other than "navigable-in-fact," then the statute delegates unbounded discretion to the Agencies to define the term, in violation of the non-delegation doctrine, and Article I of the Constitution (vesting "all legislative powers" in the Congress). *See Gundy v. United States*, 139 S. Ct. 2116, 2135-42 (2019) (Gorsuch, J., dissenting);

*id.* at 2130-31 (Alito, J., concurring); *see also Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari).

The *Rapanos* plurality, by contrast, interprets the Act to apply only to easily understood and defined bodies of water: relatively permanent and continuously flowing or standing rivers and lakes, and their immediately abutting wetlands. The Agencies' scope of regulatory discretion is much narrower and more clearly bounded under this interpretation. The plurality avoids the delegation problems which Justice Kennedy's and the Agencies' interpretations inherently embrace, and thus is also a preferable interpretation of the Act under Article I and the Non-Delegation Doctrine.

Finally, the Agencies make the puzzling claim that the *Rapanos* plurality meant "ephemeral" when it said intermittent, and therefore the government can regulate intermittent tributaries after all, despite the plurality having explicitly said it can't. The plurality cannot be read to support this. *Rapanos*, 547 U.S. at 733-34 (distinguishing ephemeral from intermittent flow); *id.* at 726-27; *id.* at 733 n.6 (citing separate agency definitions of "ephemeral" and "intermittent"). It is simply an exercise in wishful thinking that defies the text of the plurality to say that "intermittent" actually means "ephemeral" in the opinion.

Cattle Growers has demonstrated its likelihood of success on the merits.

**III.   Cattle Growers' Members Suffer Ongoing and Imminent Irreparable Harm**

Several of EPA's arguments related to the harm element and to the status quo suffer from the erroneous assertion that the Navigable Waters Protection Rule regulates the same water bodies that the prior regulation did and no more. This is false.

As to intermittent tributaries, the prior regulations only applied to channels with a bed and bank and an ordinary high-water mark. *See* 33 C.F.R. § 328.3(e) (1987). The new Rule does not require any of these features. 85 Fed. Reg. at 22,292. And, under the prior regulations and related interpretive guidance, the Agencies would only regulate intermittent (i.e. "not relatively permanent") tributaries if they had a significant nexus. Post-*Rapanos* Guidance at 1.[3] The Navigable Waters Protection Rule does away with this limitation. 85 Fed. Reg. at 22,281 (rescinding Post-*Rapanos* Guidance). So, the new Rule regulates more intermittent tributaries than the old one did. This is also true of non-abutting wetlands. The provisions challenged in the Motion expand Clean Water Act regulation in these two categories. As a result, Cattle Growers' members are subject to new regulation of water features not previously regulated.

This fact undermines the Agencies' argument that Cattle Growers are not harmed by the Rule in any way that they were not harmed by prior versions of the regulations. Plaintiff's harm derives at least from the fact that the new Rule regulates more broadly than the old one, in the specific areas of intermittent tributaries, and the three challenged categories of non-abutting wetlands.

From there, the above discussion of ripeness and injury is equally applicable to the element of harm under the injunction analysis. Wherever the regulation applies, it imposes restrictions on what may be done with the members' private property. The activities the Rule restricts are commonplace—plowing and growing crops, erosion and flood control, construction and other activities that go on routinely on farms and ranches in New Mexico. Whether planned in advance

---

[3] *Available at* https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

or taken in response to inclement weather, market conditions, or other unforeseen events, the regulation limits what members can do, and forces them to undergo a multi-year quarter-million-dollar-plus permit application or face enforcement, or forego using their property. These are all harms that are experienced now or imminently, particularly in relation to the time it takes to get the permit and the multi-year litigation timetable that has characterized recent challenges to prior versions of the regulations. *See* Frost-Maynard Decl.; *see also Oregon Cattlemen v. EPA*, Exhibit B to François Decl.

For their part, Intervenors make factually inaccurate statements about Cattle Growers' position on harm and the challenged regulations. Citing two comment letters, Intervenors claim Cattle Growers expressed support for the specific provisions challenged in this motion. This is false. The NCBA comment letter at 6-7 recommends *against* regulating tributaries without a bed and bank and that don't meet minimum flow standards. That is exactly what the new Rule does: regulates intermittent tributaries with no physical indicators like bed and bank and no minimum flow duration or volume standards. 85 Fed. Reg. at 22,292-93. And the Cattle Growers' comments at 3 support regulating only perennial streams, with the grudging suggestion that if any intermittent tributaries are to be regulated, that only those which flow for 180 days or more be included. Plaintiff is not taking positions in this case contrary to its comments. Unfortunately, Intervenors have represented the opposite of the contents of these comment letters.

Intervenors also make the odd claim that Plaintiff has waited more than forty years to challenge a regulation adopted a few weeks before it amended its complaint. As noted, the previous iteration of these regulations included fewer intermittent tributaries than the new Rule does.

Plaintiff did not delay seeking an injunction against the offending provisions of the new Rule, it moved for one before the rule took effect.

Intervenors and the Agencies are also wrong about the presumption of injury that attaches to the constitutional harms identified. Because Cattle Growers is suffering an ongoing constitutional injury, it does not need to further establish that the harm it suffers will be irreparable. *See Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cty.*, 893 F. Supp. 301, 309 (D.N.J. 1995); *Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 753 (N.D. Cal. 1989). The Agencies argue that "structural constitutional violations" do not constitute irreparable harm because these rights are not sufficiently "personal" in nature. But the two cases that the Agencies rely on involve the Supremacy Clause which only indirectly protects individual liberty. In contrast, limitations on federal power such as the Commerce Clause are directly intended to protect individual liberty. *See Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 554 (2012) (noting that limits on the Commerce Clause prevent Congress from "reachi[ng] beyond the natural extent of its authority, 'everywhere extending the sphere of its activity and drawing all power into its impetuous vortex'" (quoting The Federalist No. 48 (J. Madison)). *See also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) ("[t]he declared purpose of separating and dividing the powers of government, of course, was to 'diffus[e] power the better to secure liberty'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). *See also Boumediene v. Bush*, 553 U.S. 723, 742 (2008) (stating that the separation of powers "serves not only to make Government accountable but also to secure individual liberty"); *Freytag v. Comm'r*, 501 U.S. 868, 870 (1991) ("The leading Framers of our Constitution viewed the principle of separation of powers as the central guarantee of a just government."). Accordingly, no further

proof of irreparable harm is needed. Cattle Growers has established that its members will continue to suffer ongoing and imminent irreparable harm absent an injunction.

## IV.     Balance of Equities and the Public Interest Favor the Injunction

The Agencies' objections related to the status quo are addressed by Cattle Growers' point above that the new Rule regulates intermittent tributaries more broadly than the prior regulations and guidance. Plaintiff is entitled to seek prohibitory injunctive relief against the imposition of new regulations that are clearly illegal and which cause irreparable harm.

The Agencies also argue against what they envision as a patchwork of injunctions resulting from this Court enjoining the two provisions of the rule as to Plaintiff and its members. But the Agencies would object to a nationwide injunction even more vehemently. Plaintiff has not sought to wade into that particular fray, because it is not necessary to provide complete relief to Plaintiff's members. But if the Agencies prefer a single nationwide rule, the Court could consider a nationwide injunction against the challenged provisions. Any local confusion within New Mexico can be avoided by enjoining the two provisions throughout the state.

For their part, Intervenors fail to show any harm that would flow to downstream water quality if an injunction were issued to protect Cattle Growers' members' right to use their own property for their routine farming and ranching uses.

## CONCLUSION

Cattle Growers has standing and has demonstrated its entitlement to preliminary injunctive relief. Plaintiff respectfully asks the Court to issue the injunction.

DATED: July 14, 2020.

          Respectfully submitted:

          **PACIFIC LEGAL FOUNDATION**

          By     s/ Anthony L. François
          ANTHONY L. FRANÇOIS (Federal Bar No. 15-74)
          MOLLIE R. WILLIAMS (Cal. Bar No. 322970)*
          930 G Street
          Sacramento, California 95814
          Telephone: (916) 419-7111
          Facsimile: (916) 419-7747
          Email: TFrancois@pacificlegal.org
          Email: MWilliams@pacificlegal.org
          *Attorneys for Plaintiff,*
          *New Mexico Cattle Growers' Association*
          *\*Pro Hac Vice*

- 16 -

## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2020, I electronically transmitted the foregoing to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to registered counsel for all parties.

<u>s/ Anthony L. François</u>
ANTHONY L. FRANÇOIS
